**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Chet GOVAN, Defendant–Appellant.**

No. 97–10275.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 9, 1998.

Decided Aug. 3, 1998.

Donald J. Green (argued), Las Vegas, NV, for defendant–appellant Chet Govan.

Peter Ko (argued), Thomas M. O'Connell, Kathryn E. Landreth, Assistant United States Attorneys, Las Vegas, NV, for plaintiff–appellee United States of America.

Before: WOOD,** HALL, and O'SCANNLAIN, Circuit Judges.

** The Honorable Harlington Wood, Jr., United States Circuit Judge for the Seventh Circuit, sitting by designation.

O'SCANNLAIN, Circuit Judge:

We must decide various issues arising from convictions and sentence for federal crimes arising out of a failed robbery at a Las Vegas casino.

## I

Sometime in February 1994, Chet Govan approached fellow members of the "118th Street East Coast Crips" ("Crips"), a violent Los Angeles street gang, with a proposition to participate along with him and Melvin Foster in the robbery of a Las Vegas hotel and casino. Govan told the Crips, who included Joseph Wright, Dontel Carter, Damian Littlejohn, Jamal Brown, and John Doe, a juvenile, that he and Foster, a member of the rival "Bloods" street gang, would provide the vehicles and weapons to be used in the commission of the robbery. He also told them that Foster had been the leader in previous armed robberies. Foster thereafter met with the Crips while Govan was in jail on an unrelated offense.

On or about April 21, 1994, the members of the conspiracy travelled from Los Angeles to Las Vegas. Govan, his girlfriend Dionne Chappelle, and an unidentified female drove in a 1992 Honda automobile belonging to Chappelle. Wright, Littlejohn, Carter, Brown, and Doe travelled in a 1985 Chevrolet Astrovan belonging to Govan. They arrived the following morning, April 22, and registered for two rooms at a motel. Sometime later that day, Foster arrived and revealed for the first time that Harrah's Hotel and Casino ("Harrah's") was to be the target of the robbery.

In preparation for the crime, Foster and Brown stole a van, which they parked outside the motel. Sometime thereafter, the members of the conspiracy rehearsed several "dry runs" of the robbery. Govan oversaw each rehearsal. The following night, April 23, hours before the robbery, Foster, Wright, and Brown stole a second van and parked it in Harrah's parking lot.

On April 24, at approximately 2:47 a.m., Brown, joined by Wright, Carter, Littlejohn, and Doe, drove one of the stolen vans northbound on Las Vegas Boulevard to the front of Harrah's. As the van slowed to a stop in front of Harrah's, Wright, Carter, Littlejohn,

and Doe jumped out and entered the casino through the west entrance doors. Wright and Littlejohn were armed with the firearms Govan had obtained for them. After the passengers exited the van, Brown continued northbound on Las Vegas Boulevard, turning into an alley next to Harrah's to wait.

Wright, Carter, Littlejohn, and Doe charged into the casino, screaming at casino patrons and employees to get down on the floor. As they ran from the front door to the cashier's cage, one or more of the men struck at least two patrons with their fists or a heavy object, knocking the patrons to the floor.

Carter, Littlejohn, and Doe burst into the cashier's cage while Wright remained out front. Wright grabbed a casino patron by the hair and collar, dragging the patron around the floor as a hostage, alternatively pointing his gun at the hostage and the other patrons and employees. When the hostage begged not to be shot, Wright responded with epithets.

Meanwhile, inside the cashier's cage, Carter, Littlejohn, and Doe ordered the employees to get down on the floor. The three men removed $97,040 from the cash drawers and stuffed the money into pillowcases. They then jumped back over the cashier's counter and, along with Wright, fled through the casino, exiting into the alley where Brown was waiting with the get-away van. The perpetrators reentered the van and Brown drove away, crashing through a stationary fire gate barrier and driving into Harrah's covered parking garage. Brown parked the van next to Chappelle's car and the second stolen van. All five men exited the first van, discarded their clothes, dumped the pillowcases full of money and one of the guns into Chappelle's car, and switched into the second van. Brown, now driving the second van, drove out of the parking garage while Chappelle's car, carrying the loot, followed behind. As soon as the vehicles exited the garage, Chappelle's car split off, avoiding further detection. The van, however, was not so fortunate. A marked police car began to follow the perpetrators. Rather than give themselves up, they led police on a 20-minute high-speed chase involving numerous police

cars and a police helicopter. When the police positioned patrol cars to block the van's path, Brown purposely rammed into a police car, causing the van to skid out of control into a brick wall. The van disabled, the men fled on foot into a residential neighborhood. Police surrounded the area and, after a brief search, captured all five men.

During the robbery, Foster and Govan were waiting in Harrah's parking lot in Foster's black Chevrolet Suburban vehicle in case something went awry.

Foster and Govan were subsequently identified through telephone records and arrested. Chappelle remains a fugitive.

An eight-count indictment was returned charging Govan with conspiracy to interfere with commerce by threats or violence in violation of 18 U.S.C. § 1951, interference with commerce by threats or violence in violation of 18 U.S.C. § 1951, use of a firearm during or in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c) and 2, conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h), and money laundering in violation 18 U.S.C. § 1956(a)(1)(B)(i). Two counts of forfeiture under 18 U.S.C. § 928(a)(1) were also alleged.

A jury found Govan guilty on all counts, and the district court sentenced him to 262 months in jail. Govan timely appealed.

## II

Govan first argues that the evidence presented by the government was insufficient to support his convictions. Specifically, Govan challenges the evidence admitted to prove that he conspired to rob Harrah's and that he aided and abetted the five men who actually committed the robbery. Govan maintains that he merely "found himself in the company of young men, suspected of being the perpetrators of the planned casino robbery" and that the "caper was planned, directed and controlled by Foster at all levels."

■ Govan's argument borders on the absurd. First, evidence presented at trial confirmed that Govan recruited the members of the conspiracy from his own gang. Without his facilitation, the younger Crips would have never had any contact with Foster, a member of a rival gang. Second, one of the Crips members who testified that Govan tried to recruit him, also testified that Govan came to his house a week or two after the robbery, showed him a new truck he had purchased for $9,000, and bragged about having $60,000 in proceeds from the heist. This witness claimed that Govan threatened to kill him if he testified against him. Third, fingerprints, telephone records, and witness testimony, confirmed Govan's presence at the motel along with his co-conspirators. Fourth, Harrah's surveillance videotapes from the parking garage the night of the robbery reveal Govan's Astrovan and Chappelle's Honda rehearsing the crime at 2:02 a.m. and 2:04 a.m., about forty-five minutes before the robbery occurred. The camera spotted Govan's Astrovan again at 2:45 a.m. and 2:47 a.m., and Foster's Chevrolet Suburban at approximately 2:19 a.m. and again at 2:50 a.m., just moments after the robbery.

The foregoing is more than sufficient to enable a rational trier of fact to find the essential elements of the charged crimes beyond a reasonable doubt and, specifically, to find that Govan was involved in the underlying conspiracy. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Nash,* 115 F.3d 1431, 1435 (9th Cir.1997); *United States v. Iriarte–Ortega,* 113 F.3d 1022, 1024 n. 2 (9th Cir. 1997). Govan did not have a "mere casual association with conspiring people"; he had knowledge of the conspiracy and acted in furtherance of it. *See United States v. Medina,* 940 F.2d 1247, 1250 (9th Cir.1991).

## III

Govan next maintains that the district court's refusal to give a proposed jury instruction constitutes reversible error. Govan asked the district court to give the following instruction:

> You are instructed that as a matter of law that when there is an innocent explanation for a defendant's conduct as well as one that suggests that the defendant was engaged in wrongdoing, the government must produce evidence that would allow you, the jury, to conclude beyond a reasonable doubt that the government's explanation of the defendant's conduct is the correct one.

Govan claims that the district court's failure to give his so-called "innocent explanation" instruction prevented him from presenting his defense to the jury. According to Govan, a district court is required to give an instruction describing the defendant's theory of the case if "some" evidence regarding the issue has been presented. *See, e.g., Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988); *United States v. Escobar de Bright*, 742 F.2d 1196, 1198 (9th Cir.1984). Govan argues that a district court may reject an instruction setting forth a defendant's theory of the case only if it is in the form of a "narrative recitation of the defendant's version of the facts rather than in the form of a statement of appropriate principles of law which the jury must apply to the facts." *See United States v. Nevitt*, 563 F.2d 406, 409 (9th Cir.1977).

■ Govan overstates his authorities. Although the failure of a trial judge to instruct the jury on a theory of the defense—supported by law and with some foundation in evidence—may constitute reversible error, a judge may reject a defendant's proposed instruction if the other instructions, viewed in their entirety, adequately cover that theory. *See United States v. Mason*, 902 F.2d 1434, 1438 (9th Cir.1990). Govan's "innocent explanation" theory can be reduced to the unremarkable assertion that the government must prove beyond a reasonable doubt that he committed the crimes in question (which is always the case in every criminal trial). On this point, the district court explicitly instructed the jury that:

> The law presumes a Defendant to be innocent of crime. The law does not require a Defendant to prove his or her innocence or to produce any evidence at all.... The Government has the burden of proving every element of the charges beyond a reasonable doubt, and if it fails to do so you must return a verdict of not guilty.

In order for Govan to be convicted under the district court's instruction, the jury must necessarily reject any "innocent explanation" for his conduct that would cause them to have a reasonable doubt. This instruction by itself therefore insures that the "government's explanation of the defendant's conduct is the correct one." Govan was thus not entitled to his proposed instruction.

**IV**

Govan next raises a number of challenges to his sentence. First, he claims that the district court erred in the calculation of his criminal history category because "it is an over representation [sic] of a purely juvenile and adult misdemeanor background." Second, he maintains that "Due Process is violated when a Criminal History Category is elevated by prior petty offenses under state law." Third, Govan argues that the district court's comments regarding his prior state convictions somehow require his sentence to be vacated.

**A**

■ Govan has failed to point to any specific error committed by the district court in the calculation of his criminal history category. In calculating Govan's sentence, the district court first turned to U.S.S.G. § 4A1.2(d)(2)(A), which concerns offenses committed prior to age eighteen. Section 4A1.2(d)(2)(A) directs a sentencing court to "add 2 points under § 4A1.1(b) for each adult or juvenile sentence to confinement of at least sixty days if the defendant was released from such confinement within five years of his commencement of the instant offense." In 1984, at age 16, Govan received a 10-year sentence for attempted murder and use of a deadly weapon. He was paroled in 1991. The Harrah's robbery took place on April 24, 1994, less than five years after Govan's release from prison. Therefore, the district court correctly added two points to Govan's criminal history.

■ Next, U.S.S.G. § 4A1.1(c) instructs the district court to "[a]dd 1 point for each prior sentence not counted in [§ 4A1.1(a) or § 4A1.1(b) ], up to a total of 4 points for this item." According to § 4A1.2(a)(1), the term "prior sentence" means "any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of nolo contendere, for conduct not part of the instant offense." This includes convictions for which the imposition or execution of sentence was totally suspended or stayed. *See* U.S.S.G. § 4A1.2(a)(3).

In 1994, Govan pleaded nolo contendere to driving with a suspended license and received a 90–day suspended sentence and two-years summary probation. Also in 1994, Govan pleaded guilty to another charge of driving with a suspended license and received fifteen days in jail and three years summary probation. In 1996, he entered a nolo contendere plea to a 1994 charge of permitting another to carry a firearm and received ten days in jail and three years summary probation. Govan received three more criminal history points for these three offenses, bringing his total to five points.

Finally, U.S.S.G. § 4A1.1(d) directs the sentencing court to "[a]dd two points if the defendant committed the instant offense while under any criminal justice sentence, including *probation,* parole, supervised release, imprisonment, work release, or escape status." U.S.S.G. § 4A1.1(d) (emphasis added). At the time of the Harrah's robbery, Govan was still on probation for both 1994 offenses. Therefore, the district court correctly added two more points to his criminal history, bringing his total to seven points and putting him in Criminal History Category IV, according to the U.S.S.G. sentencing table. There was no error in calculating Govan's criminal history category.

### B

We turn next to Govan's constitutional challenges to the sentencing guidelines. Govan raises a facial challenge to the sentencing guidelines, claiming that the use of state-law offenses in determining an offender's criminal history category violates due process. Govan also claims that the sentencing guidelines, as applied to his case, violate his right to due process. Govan has couched his argument in so-called "substantive", rather than "procedural," due process terms.

The thrust of Govan's facial challenge is that consideration under the sentencing guidelines of misdemeanor crimes with summary probation and limited jail time results in sentences that are not truly reflective of an individual's criminal background or his propensity for future criminal behavior. In effect, Govan argues, the consideration of such minor offenses prevents judges from meting out individualized sentences.

■ Govan's argument is foreclosed by our decision in *United States v. Brady,* 895 F.2d 538, 539–40 (9th Cir.1990). In *Brady,* we noted that all the circuits to address the issue have unanimously concluded that the sentencing guidelines do not infringe upon a defendant's Fifth Amendment right to substantive or procedural due process by limiting the sentencing judge's discretion to individualize a sentence. *See id.* We found it unnecessary to base our decision on such broad grounds, however, holding instead that the guidelines do not infringe upon a defendant's right to an individualized sentence, to the extent such a right exists, because "[a] sentence under the guidelines continues to be highly 'individualized' under the historically accepted criteria," which includes "the defendant's criminal history, the degree of seriousness of the crime, as well as a more or less refined categorization of criminal offenses." *Id.* at 540 (citations omitted). We noted that, by requiring the sentencing court to consider all relevant factors and to articulate its reasons for departing from the guidelines, the sentencing guidelines "potentially pose fewer due process concerns than the pre-Guidelines sentencing practice of allowing nearly unfettered judicial discretion." *Id.* Unwilling to ignore our own precedent, we must reject Govan's facial challenge to the guidelines.

■ *Brady* also disposes of Govan's "as applied" due process challenge. Govan claims that the district court's consideration of his juvenile and minor offenses in determining his criminal history category resulted in a "fundamentally unfair" sentence. A sentencing court is permitted under U.S.S.G § 4A1.3 to depart from a recommended sentence if it believes that a defendant's criminal history category significantly over-represents the seriousness of his criminal record or the likelihood that he will commit further crimes. In light of this discretion, Govan's argument is reduced from challenging the absence of certain considerations under the sentencing guidelines to challenging the weight accorded those considerations, in this case, his juvenile and minor offenses. "Individualized sentencing has never included the right to challenge the weight given to various factors," however. *Brady,* 895 F.2d at 543. Govan could not have challenged the weight accorded his

prior offenses under the traditional sentencing discretion of the sentencing court and "[i]t is difficult to see how the Guidelines infringe [Govan's] individual due process rights by similarly precluding such challenges." *Id.* at 543. Hence, as applied to Govan, the sentencing guidelines do not violate his right to due process.

### C

Govan next maintains that the district judge's commentary on the insignificance of some of his prior offenses somehow warrants a remand for resentencing.

The district court stated at sentencing that:

> [I]t's tragic that sentences of summary probation and nonmeaningful sentences are imposed in our state courts.... That means that people who ultimately come into federal court under the sentencing guidelines and face very serious crimes of conviction face extremely serious consequences in terms of sentencings, and perhaps if there were meaningful sentences meted out in the state courts, that would not be the case.

Govan claims this case is similar to *United States v. Abbott,* 30 F.3d 71 (7th Cir.1994), in which a sentencing court also expressed misgivings over the appropriateness of a sentence enhanced by petty and juvenile crimes. In *Abbott,* the sentencing court concluded that it was not authorized under the sentencing guidelines to reduce the defendant's sentence to reflect its belief that the defendant was not a "villainous criminal." *See id.* at 72. The Seventh Circuit reversed, holding that the district court was wrong—under U.S.S.G. § 4A1.3, a sentencing court *does* have the authority to depart from a sentence it considers inappropriate. *See id.* at 73. Consequently, the Seventh Circuit vacated the defendant's sentence and remanded to the district court for a determination of whether a downward departure was appropriate. *See id.*

This case differs markedly from *Abbott.* First, the sentencing court here never indicated that it lacked authority to depart downward from the sentencing guidelines. Second, the court never suggested that Govan was not a particularly vicious and evil individual deserving of severe punishment.

In fact, it actually indicated the contrary, to wit:

> [W]henever we have a scenario such as presented here, where a group of people come into this community and choose to engage in really what can only be described as a *reign of terror* at that casino, seizing individuals and seizing money, placing people's lives in danger, *I can't find a bit of sympathy for those individuals and I can't find it within my mind or in my heart under the guidelines to give them minimum sentences. Those are simply not deserved in this case.*

(emphasis added). We can safely presume in light of this clear statement that the district court considered and rejected the application of U.S.S.G. § 4A1.3 to lower Govan's sentence. *See Abbott,* 30 F.3d at 73 ("Because a sentencing court is not obligated to state its reasons for refusing to depart from a sentence within the Guideline range, *United States v. Brown,* 985 F.2d 478, 481 (9th Cir. 1993), this Court would ordinarily assume that the district court's failure to utilize a Guideline provision available to it, indicated that it had considered and rejected it application."). Because the district court did not indicate that it lacked discretion to depart from the sentencing guidelines, we have no authority to review its refusal to do so. *See United States v. Webster,* 108 F.3d 1156, 1158 (9th Cir.1997); *United States v. Berger,* 103 F.3d 67, 69 (9th Cir.1996). Hence, Govan's challenge must fail.

### V

Govan next claims that the district court wrongly enhanced his offense level under U.S.S.G. § 3B1.1(a), which permits a four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Specifically, Govan contends that the district court erred in adopting the presentence report's factual findings on his role in the conspiracy. He maintains that the district court should have made its own factual findings as to his alleged leadership role. Further, Govan argues that it was Foster, not he, who organized, led, and set up the plan to rob Har-

rah's, and thus, his sentence should not have been enhanced.

■ Addressing Govan's first claim, he is correct that the district court did not make any specific factual findings as to his leadership role. However, it was not required to do so; a "district court need·not make specific findings of fact in support of an upward role adjustment." *United States v. Ponce,* 51 F.3d 820, 826 (9th Cir.1995).

■ Turning to Govan's second claim, although Foster appears to have been the more dominant member of the conspiracy, "[t]here can, of course, be more than one person who qualifies as a leader or organizer." ·U.S.S.G. § 3B1.1 n. 4. In determining whether a person is a leader or organizer for purposes of the sentencing guidelines, the district court may consider,

> "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, n. 4. The inquiry focuses on all aspects of relevant conduct, not merely the defendant's role in the counts of the conviction.

*See United States v. Rose,* 20 F.3d 367, 373 (9th Cir.1994).

Govan's role was considerably more significant than he wishes us to believe. The record reveals that Govan recruited the perpetrators of the crime and facilitated their interaction with Foster. He provided firearms and transportation. He supervised the numerous "dry runs" at Harrah's. He remained with Foster in Harrah's parking lot during the commission of the crime, away from any immediate danger. Following the robbery, Govan retained $60,000 of the $97,040 stolen from Harrah's. No evidence was presented that he ever distributed any of that $60,000 to the members of the conspiracy. Govan "received the largest compensation, caused the group to be formed, [and] ... recruited accomplices." *Rose,* 20 F.3d ·at 374. There was no error

in the district court's determination that Govan was a leader-organizer.

■ Nevertheless, Govan maintains that the district court erred by failing explicitly to find that the conspiracy satisfied the second prong of U.S.S.G. § 3B1.1(a), *i.e.,* that it involved five or more participants *or* was otherwise extensive. As was noted at Govan's sentencing, however, Foster, Carter, Wright, Littlejohn, and Brown all entered into plea agreements with the· government. Including Govan and Chappelle (who is still on the run), that makes seven members of the conspiracy. Although the number of participants alone is sufficient under U.S.S.G. § 3B1.1(a), the conspiracy was clearly "otherwise extensive" as well. It involved interstate travel, a large number of victims— including, but not limited to, Harrah's and its terrorized patrons—as well as nearly $100,-000 in robbery proceeds. This case is the paradigm of "otherwise extensive" criminal activity. *See Rose,* 20 F.3d at 374 ("Whether criminal activity is 'otherwise extensive' depends on such factors as (i) the number of knowing participants and unwitting outsiders; (ii) the number· of victims; and (iii) the amount of money fraudulently obtained or laundered.") (citations omitted). Hence, Govan's sentence was properly enhanced.

## VI

Finally, Govan argues that the probation officer improperly assumed the role of advocate at his sentencing hearing by explaining the difference between his sentence and that of his co-conspirators.

Govan argued at sentencing that it would be unfair for him to receive a greater sentence than his co-conspirators because they had "brandished firearms, held · a casino guest at bay by a shirt collar, frightened casino workers, including a pregnant woman, and led the police on a twenty-minute high-speed chase from the Las Vegas Stip [sic] through residential areas." After Govan concluded his remarks, the probation officer, Officer Robert Musser, asked the district court if he could "make a few points," to which the court responded "Sure." The following exchange thereafter occurred:

PROBATION OFFICER: [Defense counsel] keeps comparing Mr. Govan and Mr. Foster to the four underlying individuals that committed the robbery when it's not even a close comparison. The four individuals, Mr. Carter, Wright, Littlejohn and Brown, entered into plea agreements with the government. There was no 924(c). The 5 levels for the gun was added right into the guideline calculation.

COURT: I understand that and different criminal history categories. Those were the product of negotiation and–

PROBATION OFFICER: It changed everything. It changed the upward departure issues, it changed—gave them 3 levels for acceptance.

COURT: Yeah.

PROBATION OFFICER: There was no leadership role there. So Mr. Govan stands before the Court with a leadership role, with a 924(c), with an adjustment because the 924(c) took away the 5 levels to the guideline calculation, and I just want to point out that the reason the guideline is so high with the departure issue is for all those reasons and he is not comparable to the other five individuals here for those reasons.

Govan claims that the probation officer's statements "crossed the line into impermissible advocacy" and undermined his argument that his recommended sentence was fundamentally unfair in comparison to his co-conspirators. Govan maintains that this case is controlled by *United States v. Sifuentez*, 30 F.3d 1047 (9th Cir.1994), in which we noted in the context of a presentence report that "[c]ertain language may stray sufficiently far from the essential purpose of analyzing the departure grounds to constitute excessive, and impermissible, advocacy or argument." *Id.* at 1049.

■ The language in this case, however, does not so stray. Officer Musser's statements were notably milder than the language we held unobjectionable in *Sifuentez*. In *Sifuentez*, the probation officer responded to the defendant's argument that he was entitled to a downward departure from the sentencing guidelines by writing:

We disagree. Defendant's count of conviction ... reveals that defendant possessed

drugs while in prison. *It is our opinion that defendant's possession of drugs in prison jeopardized the safety and security of the institutional staff and inmates....* Defense counsel also contends that the mandatory sentence of 120 months for [defendant's] prior felony conviction is a factor strongly supporting a downward departure. We disagree. This sentence should have been a deterrence for [defendant] preventing further criminal activity. However, *this does not appear to be the case as [defendant] continued to engage in criminal drug activity.*

*Sifuentez*, 30 F.3d at 1048 (emphasis added). We held that the foregoing, while "strong" and "close to crossing the line into impermissible advocacy," did not ultimately depart from what is acceptable. *See Sifuentez*, 30 F.3d at 1049–50.

This is a much easier case. Officer Musser's language is not even "close to crossing the line." Unlike the probation officer in *Sifuentez*, Officer Musser did not inject his personal opinions into the proceedings. He was merely explaining the basis for his recommendation. Surely, a probation officer is entitled to do as much.

■ In any event, there appears to have been no prejudice against Govan. *See Sifuentez*, 30 F.3d at 1050. The probation officer did not tell the district court anything it did not already know. As Officer Musser began his explanation, the district court noted that it was aware of what he sought to point out, stating "Oh, I understand that and different criminal history categories. Those were the product of negotiation...." As noted in *Sifuentez*, we "must rely on the integrity of district court judges in sentencing matters." *Id.* at 1049. We are certain that district court judges have the ability to listen to a probation officer's recommendation or read a pre-sentence report without being improperly influenced. *See, e.g., Sifuentez*, 30 F.3d at 1049. There is no reason to disregard that long-held belief here.

AFFIRMED.