**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 3 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee/
    Cross-Appellant,

v.

MIGUEL VIRGEN-CHAVARIN,

    Defendant-Appellant/
    Cross-Appellee.

Nos. 02-8052/02-8076

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. No. 01-CR-131-02-J)

---

David A. Kubicheck, Assistant United States Attorney (Matthew H. Mead, United States Attorney and Patrick J. Crank, Assistant United States Attorney, on the brief), Casper, Wyoming, for Plaintiff-Appellee.

Ronald G. Pretty, Cheyenne, Wyoming, for Defendant-Appellant.

---

Before **HENRY**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

---

A grand jury indicted Martin Jimenez-Oliva ("Martin"), Miguel Virgen Chavarin

("Chavarin"), Aurelio Topete-Plascencia ("Topete"), Melchor Jimenez-Oliva

("Melchor"), Laurencio Jimenez-Oliva ("Laurencio"), Lorenzo G. Delgado ("Delgado"),

Roberto Montoan-Herrera ("Herrera"), Angel Contreras-Castellanos ("Castellanos"), and

Joseph Ramirez ("Ramirez") for various violations of Titles 8, 18, and 21 of the United

States Code.[1]  The Indictment charged Chavarin with (1) conspiracy to possess with intent

to distribute, and to distribute, methamphetamine and cocaine, (2) distribution of

methamphetamine, and (3) aiding and abetting the distribution of methamphetamine.

Chavarin pled guilty to each count after plea negotiations with the Government failed.[2]

At the conclusion of a three day sentencing hearing, the district court found

Chavarin's base offense level under the United States Sentencing Guidelines ("U.S.S.G."

or "Guidelines") was thirty six.  The district court denied Chavarin's request for (1) a two

level reduction of his base offense level pursuant to the "safety valve" provisions of the

---

[1] Decided and filed together with the companion cases of United States v. Jimenez-Oliva, Nos. 02-8053/02-8077, ___WL___ (10th Cir. 2003) (unpublished disposition); United States v. Topete-Plascencia, Nos. 02-8060/02-8078, ___F.3d___ (10th Cir. 2003); United States v. Montoan-Herrera, Nos. 02-8061/02-8079, ___F.3d___ (10th Cir. 2003). The facts relevant to all three dispositions are set forth in this opinion.

[2] Chavarin, Laurencio, Topete, and Herrera entered "cold pleas" to the charges in the Indictment.  A "cold plea" is a guilty plea that is entered in the absence of a plea agreement with the Government.  See United States v. Asch, 207 F.3d 1238, 1240 (10th Cir. 2000).  The Government offered Chavarin, Laurencio, Topete, Herrera, and Castellanos a "package" plea agreement.  (R. Vol. 5 at 505-506, 532, 600-01, 608-09). That plea agreement was conditioned on, among other things, each of the five Defendants pleading guilty.  (R. Vol. 5 at 600).  After Castellanos exercised his constitutional right to a jury trial, the Government withdrew its plea agreement with the remaining four Defendants.  (Id.).  We express no opinion on the propriety of such bargaining by the Government except as it pertains to the Government's cross-appeal.  See Fed. R. Crim. P. 11(c)(1) (noting that the "court shall not participate in [plea agreement] discussions.").

2

Guidelines, and (2) a four level downward adjustment for his mitigating role in the offense. The district court, however, adjusted Chavarin's base offense level downward three levels for timely acceptance of responsibility. With a final base offense level of thirty three, and a criminal history category of I, the district court sentenced Chavarin to a term of 135 months imprisonment. Both Chavarin and the Government appeal from the district court's final sentence. See 18 U.S.C. § 3742(a),(b). We have jurisdiction under 18 U.S.C. § 3742 and affirm.

I.

In 1999, Jorge Contreras was the leader of an organization that distributed controlled substances in Casper, Wyoming. Contreras, like his predecessors and successors in Casper, was part of a larger organization that distributed controlled substances, primarily methamphetamine and cocaine, in several states. The leaders of the smaller organizations, like Contreras in Casper, were supplied with drugs from Mexico, California, and Arizona. The larger organization would deliver the drugs, in amounts between seven and fifty pounds, into Casper approximately every fifteen days. At the time each shipment would arrive, the individuals in the Casper organization would deliver the money they had made from the previous delivery, absent their share of the proceeds. Eventually, the money would be transported back to Mexico. If the leaders or members of the Casper organization were arrested, the larger organization in Mexico would recruit new members to replace the arrestees.

In May 1999, Jorge Contreras moved into a residence with Defendant Herrera. During the time Contreras and Herrera were in charge of the Casper organization, they distributed approximately 200 pounds of methamphetamine. Contreras was arrested on December 11, 1999; however, Herrera disappeared and was not apprehended.

In early 2000, Manuel Lopez-Soberanis arrived in Casper to replace Contreras. In March 2000, Lopez-Soberanis was arrested. He was replaced the next month by Defendant Martin. It is believed that Martin's brother, Defendant Laurencio, joined him in Casper in November 2000. At various intervals thereafter, the remaining Defendants joined Martin and Laurencio in Casper to partake in the distribution of methamphetamine and cocaine.

Martin's organization distributed controlled substances in Casper primarily from three locations: an apartment at 948 North Park Avenue ("North Park Apartment"); a house at 211 ½ K Street; and a house at 530 Chestnut Street ("Chestnut House"). Generally, Defendants Chavarin and Topete would obtain methamphetamine from Martin at the North Park Apartment. Defendant Delgado testified that he observed Chavarin and Topete obtain at least a pound of methamphetamine from both the North Park Apartment and Chestnut House.[3] Delgado also testified that he obtained a pound of

---

[3] After Delgado was arrested, he agreed to assist the Government with hopes he would receive a downward departure on his sentence. See U.S.S.G. § 5K1.1. Delgado testified before the district court at Castellanos' trial and at the sentencing hearing. Delgado's testimony assisted the Government in securing a conviction against

(continued...)

methamphetamine from Martin. While the organization primarily distributed drugs from the North Park Apartment and Chestnut House, they stored some of their controlled substances at Delgado's "stash house."

Meanwhile, Agents Steve Woodson and Thomas Duncan of the United States Drug Enforcement Administration ("DEA") testified that they began to investigate Martin and his associates. On April 5, 2001, the DEA, through a confidential informant, purchased 112.4 grams of methamphetamine from Defendants Martin and Topete. On April 13 and May 4, 2001, the DEA purchased another 55.7 and 109.7 grams of methamphetamine from Martin and Topete respectively.

Martin returned to Mexico in the summer of 2001 and has never been apprehended. After Martin left, Defendant Laurencio assumed control over the Casper organization. During the summer of 2001, Laurencio met his methamphetamine sources from Arizona at Delgado's house on two or three occasions. On one such occasion, Laurencio called Topete, Chavarin, Castellanos, and Herrera and told them that the source was at Delgado's house. Those individuals arrived shortly and paid the source an undetermined amount of money.

In August 2001, the confidential informant introduced Agent Duncan, who was working undercover, to Laurencio and Topete. On August 12, 2001, Agent Duncan met

---

[3](...continued)
Castellanos and in establishing Chavarin's, Laurencio's, Topete's, and Herrera's relevant conduct for sentencing.

Laurencio and Chavarin to consummate a prearranged deal for half a pound of methamphetamine. During the transaction, Laurencio and Chavarin "fronted" (i.e., sold on credit) Agent Duncan a half pound of methamphetamine. On August 19, 2001, Agent Duncan arranged to pay Laurencio – the person Agent Duncan felt he was "doing the deals with" – for the methamphetamine that had been fronted the previous week. Agent Duncan paid Laurencio and Topete $5,000 for the methamphetamine. At that meeting, Agent Duncan was fronted another half pound of methamphetamine.

On August 28, 2001, Agent Duncan met Laurencio and Topete to pay for the methamphetamine. At this transaction, Laurencio and Topete were only able to front Agent Duncan two ounces of methamphetamine. Agent Duncan expressed his dissatisfaction with dealing in such small quantities. Laurencio replied that he would work on obtaining larger quantities of methamphetamine.

Delgado testified that in early September 2001, an unidentified Mexican male driving a station wagon with Arizona plates met Laurencio at Delgado's house. The driver of the station wagon asked Laurencio for tools in order to obtain drugs from the vehicle's spare tire. After cutting open the spare tire, the driver of the station wagon retrieved approximately six pounds of methamphetamine and an unknown quantity of cocaine from the tire.

On September 13, 2001, Agent Duncan met with Defendants Laurencio, Melchor, and Chavarin. Agent Duncan paid Laurencio for the two ounces of methamphetamine he

6

was fronted on August 28, 2001. Laurencio also directed Chavarin to give Agent Duncan more methamphetamine. Chavarin fronted Agent Duncan another pound of methamphetamine. On September 28, 2001, Agent Duncan met Laurencio and paid him for that pound of methamphetamine. During the deal, Laurencio informed Agent Duncan that a problem had arisen and that he would be returning to Mexico for two weeks. Laurencio also said that Agent Duncan could continue to deal with Topete while he was gone. Agent Duncan then discussed the possibility of obtaining larger quantities of methamphetamine from Laurencio. Laurencio agreed to provide Agent Duncan with six pounds of methamphetamine in late October when he returned from Mexico.

The DEA decided to arrest Laurencio before he left for Mexico. Laurencio and Herrera were arrested on September 28, 2001. On October 3, 2001, Topete fronted Agent Duncan a half pound of methamphetamine. Topete also agreed to deliver another four pounds of methamphetamine to Agent Duncan. The next day, the DEA arrested Topete and Chavarin. Delgado was arrested on November 30, 2001. After Delgado's arrest, the DEA searched his house and seized over a pound of methamphetamine.

## II.

On appeal, Chavarin challenges the district court's (1) finding that he was not entitled to the benefit of the Guidelines' safety valve provisions, (2) finding that he was not entitled to a four level downward adjustment on his base offense level for his minimal participation in the conspiracy, (3) failure to correct irregularities that allegedly occurred

7

in the preparation of his presentence investigative report ("PSR"), and (4) witness credibility findings. We discuss each in turn.

## A.

First, Chavarin challenges the district court's finding that he was not entitled to the benefit of the Guidelines' safety valve provisions. See U.S.S.G. §§ 2D1.1(b)(6), 5C1.2(a). The district court found Chavarin was not entitled to the "safety valve" because he did not provide "all information and evidence [he had] concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan[.]" (R. Vol. 6 at 689). We review a district court's application of the Guidelines' safety valve provisions for clear error. United States v. Roman-Zarate, 115 F.3d 778, 784 (10th Cir. 1997). We are cognizant that the district court's application of the safety valve is fact specific and dependent on credibility determinations that cannot be replicated with the same accuracy on appeal. See United States v. Acosta-Olivas, 71 F.3d 375, 378 n.3 (10th Cir. 1995).

## 1.

As part of the Violent Crime Control and Law Enforcement Act of 1994, Congress enacted a "safety valve" to the mandatory minimum sentences established by 21 U.S.C. §§ 841, 844, 846, 960, and 963. See 18 U.S.C. § 3553(f); U.S.S.G. § 2D1.1 comment.

(n.7); Acosta-Olivas, 71 F.3d at 378.  The "safety valve" allows a district court to sentence a defendant without regard to the statutory minimum sentence if:

> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines; (2) the defendant did not use violence . . . or possess a firearm . . . in connection with the offense; (3) the offense did not result in death or serious bodily injury to any person; (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense . . . and (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct of a common scheme or plan . . . .

18 U.S.C. § 3553(f)(1)-(5).

The Guidelines also provide a two level downward adjustment on a defendant's base offense level if he satisfies the five criteria set forth in § 3553(f).  U.S.S.G. §§ 2D1.1(b)(6), 5C1.2(a)(1)-(5).  The defendant must prove, by a preponderance of the evidence, that he has satisfied each criterion to be entitled to the two level adjustment. United States v. Verners, 103 F.3d 108, 110 (10th Cir. 1996).  The criterion at issue in this case – § 5C1.2(a)(5) – requires a defendant to truthfully provide the Government with "all information and evidence" he has concerning the offense of conviction.  18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2(a)(5).  When the offense of conviction is conspiracy, the criterion requires a defendant to disclose "everything he knows about his own actions and those of his co-conspirators."  Acosta-Olivas, 71 F.3d at 378; U.S.S.G. § 5C1.2 comment. (n.7).  Under § 5C1.2(a)(5), the district court "must determine the quality and completeness of all information furnished to the government by [d]efendant."  United

9

States v. Gama-Bastidas, 142 F.3d 1233, 1242 (10th Cir. 1998). If the district court finds that the defendant failed to disclose everything he knows concerning his convictions and relevant conduct, it may deny the two level "safety valve" reduction under § 2D1.1(b)(6). United States v. Patron-Montano, 223 F.3d 1184, 1189 (10th Cir. 2000).

2.

Chavarin pled guilty to, among other things, conspiracy to possess with intent to distribute, and to distribute, in excess of 500 grams of methamphetamine and cocaine. Prior to sentencing, Chavarin failed to provide the Government with "all the information and evidence" he had concerning his offenses. Chavarin, however, filed an affidavit fifteen minutes prior to the commencement of the sentencing hearing purporting to set forth all the truthful information he had "as to his role in the offense." The Government claimed that it was not aware Chavarin had filed an affidavit until the sentencing hearing concluded.[4] (R. Vol. 6 at 682). In fact, Agent Woodson testified at the sentencing hearing that Chavarin had not provided the Government with information regarding his involvement in the conspiracy. (R. Vol. 4 at 88).

The district court found that Chavarin failed to satisfy 18 U.S.C. § 3553(f)(5), and hence § 5C1.2(a)(5), because he failed to provide any useful information in his affidavit

_____

[4] We need not decide whether Chavarin's failure to notify the Government of his affidavit satisfied § 5C1.2's requirement that the defendant provide *the Government* with all truthful information "not later than the time of the sentencing hearing" because Chavarin's affidavit clearly fails to set forth sufficient information about his role, and the role of his co-conspirators, in the conspiracy. See Gama-Bastidas, 142 F.3d at 1242 n.14.

about his co-conspirators. (R. Vol. 6 at 688). This finding is supported by the record and not clearly erroneous. Chavarin was less than forthcoming in his affidavit. For example, Chavarin's affidavit explains that he was involved in the conspiracy, however, he denies being involved with any other drugs but methamphetamine. This statement is in direct contradiction with his guilty plea of conspiracy to possess with the intent to distribute *cocaine*. Accordingly, Chavarin was not entitled to a two level downward adjustment under § 5C1.2.[5]

## B.

Second, Chavarin challenges the district court's finding that he was not entitled to a four level downward adjustment on his base offense level for his minimal participation in the conspiracy. See U.S.S.G. § 3B1.2(a). The district court found Chavarin was not entitled to the minimal participant adjustment because he was involved in the delivery of significant amounts of cash and methamphetamine. (R. Vol. 6 at 690, 693-94). We review a "sentencing court's refusal to award a defendant minor or minimal participant status for clear error because it is a finding of fact." United States v. Chavez, 229 F.3d

---

[5] The two cases Chavarin relies upon in his brief do not compel a different result. See United States v. Tournier, 171 F.3d 645, 646 (8th Cir. 1999) (affirming the district court's application of the Guidelines' safety valve provisions to a defendant who provided "complete and truthful information" to the Government just prior to the sentencing hearing); United States v. Velasquez, 141 F.3d 1280, 1283 (8th Cir. 1999) (affirming the district court's denial of a reduction under the Guidelines' safety valve provisions because the district court found the information in the defendant's affidavit was inconsistent with the facts).

946, 956 (10th Cir. 2000); see also U.S.S.G. § 3B1.2 comment. (n.3(C)). We "give due deference to the court's application of the sentencing guidelines to the facts." United States v. James, 157 F.3d 1218, 1219 (10th Cir. 1998).

1.

The Guidelines' mitigating role adjustment provides that a defendant is eligible to receive between a two and four level downward adjustment on his base offense level depending on whether his involvement was minimal, minor, or somewhere in between. U.S.S.G. § 3B1.2. A minimal participant is eligible for a four level downward adjustment, a minor participant is eligible for a two level downward adjustment, and a participant whose role is between minimal and minor is eligible for a three level downward adjustment. Id. § 3B1.2(a)-(b). A minimal participant is one who is "plainly among the least culpable of those involved in the conduct of a group." Id. § 3B1.2 comment. (n.4).

"A defendant has the burden of establishing, by a preponderance of the evidence, that he is entitled to a reduction in [his] base offense level under § 3B1.2." United States v. Onheiber, 173 F.3d 1254, 1258 (10th Cir. 1999). A defendant is not entitled to a minimal participant adjustment if he plays a "significant role" in facilitating a drug trafficking scheme. United States v. Ayers, 84 F.3d 382, 384 (10th Cir. 1996). A defendant plays a significant role in facilitating a drug trafficking scheme when the

12

evidence indicates that he helped orchestrate the sale of drugs and was involved in the proceeds from the sales. See United States v. Garcia, 182 F.3d 1165, 1175-76 (10th Cir. 1999); Chavez, 229 F.3d at 956. The defendant's own assertion that he was a minimal participant is not enough to overcome the clearly erroneous standard. United States v. Ballard, 16 F.3d 1110, 1115 (10th Cir. 1994); U.S.S.G. § 3B1.2 comment. (n.3(C)).

2.

Chavarin failed to prove by a preponderance of the evidence that he was entitled to a downward adjustment because he was a minimal participant in the conspiracy. Delgado, whom the district court found credible, testified that he observed Chavarin obtain at least a pound of methamphetamine from the North Park Apartment and Chestnut House. Chavarin delivered over a pound of methamphetamine to the DEA during the course of the conspiracy. At one point, Chavarin directly negotiated with Agent Duncan over the price of the methamphetamine. (R. Vol. 4 at 244). Delgado also observed Chavarin deliver a "roll" of money to Laurencio's methamphetamine source from Arizona. (R. Vol. 3 at 57). Thus, the record supports the district court's finding that Chavarin played a significant role in facilitating this drug conspiracy. The records shows Chavarin obtained drugs, negotiated the price of drugs, sold drugs, and returned money to drug suppliers. Accordingly, the district court's finding that Chavarin was not entitled to a minimal participant adjustment pursuant to U.S.S.G. § 3B1.2(a) was not clearly erroneous.

13

C.

Third, Chavarin claims he is entitled to be re-sentenced because three irregularities occurred in the preparation of his PSR. Prior, during, and at the conclusion of the sentencing hearing, the district court denied Chavarin's objections to his PSR and the manner in which it was prepared. We review factual findings of a district court relating to sentencing issues for clear error. United States v. Garcia, 78 F.3d 1457, 1462 (10th Cir. 1996). We review any legal issues involved *de novo*. Id.

1.

Under the Guidelines, accuracy is paramount in the sentencing process. See United States v. Washington, 146 F.3d 219, 223 (4th Cir. 1998). To this end, "the probation officer acts as an agent of the court charged with assisting the court in arriving at a fair sentence." United States v. Gordon, 4 F.3d 1567, 1571 (10th Cir. 1993). In so assisting, the probation officer is free to offer information to the district court within "the parameters of the Guidelines." United States v. Easterling, 921 F.2d 1073, 1080 (10th Cir. 1990). Moreover, the probation officer may communicate ex parte with the sentencing court because of the close working relationship between the two. United States v. Davis, 151 F.3d 1304, 1306 (10th Cir. 1998).

A probation officer is required to conduct a presentence investigation and report the results of the investigation to the district court before the imposition of a sentence. 18 U.S.C. § 3552(a); Fed. R. Crim. P. 32. "Federal Rule of Criminal Procedure 32 provides

for focused, adversarial development of the factual and legal issues relevant to determining the appropriate Guidelines sentence." Burns v. United States, 501 U.S. 129, 134 (1991). Rule 32 provides for this development by, among other ways, permitting the parties to object to the report. Fed. R. Crim. P. 32(f); Burns, 501 U.S. at 135. After receiving objections, the probation officer may meet with the parties to discuss the objections, investigate further, and revise the PSR as appropriate. Fed. R. Crim. P. 32(f)(3). The probation officer must then submit the PSR and any addendum addressing the objections to the district court. Fed. R. Crim. P. 32(g).

The Ninth Circuit has noted that language by a probation officer in a PSR "may stray sufficiently far from the essential purpose of analyzing the departure grounds to constitute excessive, and impermissible, advocacy or argument." United States v. Sifuentez, 30 F.3d 1047, 1049 (9th Cir. 1994). A probation officer, however, does not engage in impermissible advocacy when he merely explains his recommendation. United States v. Govan, 152 F.3d 1088, 1097 (9th Cir. 1998). The Ninth Circuit made clear that it relied on the integrity of district judges in sentencing matters and "[is] certain that district court judges have the ability to listen to a probation officer's recommendation or read a presentence report without being improperly influenced." Govan, 152 F.3d at 1097; Sifuentez, 30 F.3d at 1049.

A violation of Rule 32, however, does not automatically require that a defendant's sentence be vacated. United States v. Archer, 70 F.3d 1149, 1151 (10th Cir. 1995).

Rather, a defendant's final sentence will only be vacated if he suffered prejudice as a result of the Rule 32 violation. Id. To establish prejudice, defendant must show: (1) the PSR contained factual inaccuracies; and (2) a successful objection to the factual inaccuracies in the PSR would have resulted in a shorter sentence. See id.; United States v. Rangel-Arreola, 991 F.2d 1519, 1526 (10th Cir. 1993). When a defendant fails to assert contradictory facts that challenge the accuracy of the PSR, he has failed to demonstrate prejudice and it would be meaningless to remand for re-sentencing. Archer, 70 F.3d at 1151.

2.

Chavarin raises three challenges to the process in which his PSR was prepared, arguing that the alleged irregularities require us to vacate his sentence and remand for re-sentencing. Chavarin does not state how or why these alleged irregularities violate Rule 32 or prejudiced his sentencing. Nevertheless, we will address each argument.

First, Chavarin argues that the probation officer engaged in impermissible advocacy on behalf of the Government in preparing his PSR. Chavarin claims "the Probation Officer made statements in his pre-sentence report that were very incendiary, misleading and had to be designed to inflame the judge and improperly influence him." (Aplt's Br. at 24). The statements Chavarin challenges are: (1) Chavarin was "recruited to distribute controlled substances;" (2) Chavarin "had no documented employment in Casper;" (3) Chavarin's "sole purpose for being in Wyoming was to distribute

16

methamphetamine;" and (4) Chavarin's "wife continued to reside in Aspen, Colorado prior to his arrest." (R. Vol. 9 at 16).

The probation officer did not impermissibly advocate for the prosecution; instead, he merely explained the basis for his recommendation. See Govan, 152 F.3d at 1097. The probation officer's language was not intended to "inflame" the sentencing court. Likewise, the probation officer's statements were not misleading. The probation officer testified at the sentencing hearing that the disputed statements were "the results of [his] investigation, the results of looking at relevant conduct, [and] the various documentation in the case." (R. Vol. 5 at 321). Further, the record supports each of the probation officer's disputed statements: (1) Agent Woodson testified that all Defendants were recruited from the same small village in Mexico to come to the United States and distribute drugs, (R. Vol. 4 at 55-57); (2) Chavarin never proved that he had "documented employment" in Wyoming although he was paid for "spot-labor" work in cash, (R. Vol. 4 at 235-36, 238); (3) Chavarin never proved where his wife was living when he was arrested, (R. Vol. 4 at 212-225); and (4) the probation officer's inference that Chavarin's sole purpose in Wyoming was to distribute drugs was justified considering Chavarin resided at the house where the majority of the drug transactions commenced and he had

no documented income.  Therefore, we hold the probation officer did not impermissibly advocate for the prosecution and Chavarin was not prejudiced in any manner.[6]

Second, Chavarin challenges the district court's denial of his motion to have an independent probation officer conduct the PSR.  Chavarin claims the Government "lobbied the probation officer" and persuaded him to file an addendum to the PSR that increased Chavarin's base offense level.  The record, however, demonstrates that the Government did not improperly influence the probation officer.  In fact, both the Government and Chavarin filed objections to the PSR.  Thereafter, the probation officer, as permitted by Rule 32, conducted further investigation and concluded sufficient evidence existed to hold Chavarin accountable for the reasonably foreseeable acts of his co-conspirators.  The district court agreed and found that "defendant should be charge[d] with the 5 to 15 kilogram amount of drug dealing that was characterized as what was going on in Casper by the defendant and his co-defendants in this case." (R. Vol. 6 at 698-99).  The record supports the district court's drug quantity finding, which is the basis for Chavarin's base offense level of thirty six.  Chavarin has not appealed the court's drug

---

[6] We also decline Chavarin's invitation, suggested at oral argument, to fashion a rule that requires counsel for the defendant and Government to be present anytime the district judge meets with a probation officer.  See Davis, 151 F.3d at 1306.  We are certain the district court judges in this Circuit have the ability to listen to a probation officer's recommendation without being improperly influenced.  See Govan, 152 F.3d 1097.

18

quantity finding. Accordingly, Chavarin is not entitled to be re-sentenced because the Government's alleged misconduct did not prejudice him.

Third, Chavarin argues he is entitled to be re-sentenced because the Government denied the probation officer the right to make copies of all of its investigative reports concerning the case. At the sentencing hearing, however, the probation officer testified that (1) he was never denied access to the Government's investigative materials, (2) he was able to adequately prepare the PSR, and (3) to his knowledge, the PSR was correct. As such, Chavarin did not suffer any prejudice as a result of the Government's refusal to allow the probation officer to copy all of its investigative reports. Therefore, Chavarin is not entitled to be re-sentenced because of this alleged violation of Rule 32.

## D.

Fourth, Chavarin challenges the district court's finding that Delgado was a credible witness. The district court found Delgado's testimony credible because it was consistent and corroborated by several witnesses. (R. Vol. 6 at 675, 689-90). In assessing Delgado's credibility, the district court took into account that Delgado would probably benefit from his testimony through a reduction in his sentence and that he drank heavily during the relevant time periods. (R. Vol. 6 at 689-90). We review a district court's determination of witness credibility for clear error. United States v. Cavely, 318 F.3d 987, 992 (10th Cir. 2003).

19

## 1.

"The credibility of a witness at sentencing is for the sentencing court, who is the trier of fact, to analyze." United States v. Deninno, 29 F.3d 572, 578 (10th Cir. 1994). "We will not hold that testimony is, as a matter of law, incredible unless it is unbelievable on its face, i.e., testimony as to facts that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature." United States v. Mendez-Zamora, 296 F.3d 1013, 1018 (10th Cir. 2002) (internal quotations and brackets omitted). In other words, the district court's determination of a witness's credibility at a sentencing hearing is "'virtually unreviewable on appeal[.]'" United States v. Jones, 160 F.3d 473, 480 (8th Cir. 1998) (quoting United States v. Candie, 974 F.2d 61, 64 (8th Cir. 1992)).

## 2.

The district court heard Delgado testify at Castellanos' trial and at the sentencing hearing. After both, the court found Delgado's testimony consistent and corroborated by the Government's and Defendants' evidence. (R. Vol. 6 at 674-75). We have carefully reviewed the record in this case and agree with the district court that the evidence presented at the sentencing hearing substantially corroborates Delgado's testimony. The district court recognized that Delgado told several lies to a confidential informant while he was intoxicated one afternoon; however, the court found Delgado testified truthfully

under oath at both the Castellanos trial and Chavarin's sentencing hearing. We have found no reason to disturb this finding on appeal.

III.

The Government cross-appeals the district court's decision to adjust Chavarin's sentence downward three levels for timely acceptance of responsibility. See U.S.S.G. § 3E1.1 (Nov. 1, 2002). The Government argues Chavarin was not entitled to the adjustment because he frivolously contested his relevant conduct. The district court found that Chavarin was entitled to a three level downward adjustment for acceptance of responsibility because he timely pled guilty and gave a factual basis for that plea. We apply the Guidelines that were in effect – the November 1, 2001 Guidelines Manual – on the date Chavarin was sentenced.[7] See Landgraf v. USI Film Prod., Inc., 511 U.S. 244, 265 (1994) (noting "the presumption against retroactive legislation"); see also U.S.S.G. § 1B1.11(a) (explaining that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."). We review an acceptance of responsibility

---

[7] During the pendency of Chavarin's appeal, the Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub. L. No. 108-21, 117 Stat. 650 (April 30, 2003) became effective. Section 401(g) of the PROTECT Act amended the Guidelines' acceptance of responsibility adjustment. Prior to the amendment, the defendant was entitled to (1) a two level adjustment if he clearly demonstrated acceptance of responsibility for his offense, and (2) an additional one level adjustment if the district court found he "timely" notified authorities of his intention to plead guilty. Under section 401(g), however, a defendant is only entitled to the additional one level adjustment for "timely" acceptance of responsibility "upon formal motion by the Government at the time of sentencing." See U.S.S.G. § 3E1.1 comment. (n.6) (April 30, 2003 Supplement to the 2002 Guidelines Manual).

21

adjustment for clear error.  United States v. Amos, 984 F.2d 1067, 1071 (10th Cir. 1993);

U.S.S.G. § 3E1.1 comment. (n.5).[8]

A.

The Guidelines in effect at the time Defendants were sentenced provided a two

level downward adjustment "[i]f the defendant clearly demonstrates acceptance of

responsibility for his offense[.]"  U.S.S.G. § 3E1.1(a) (Nov. 1, 2002).  The Guidelines

also provided a defendant was entitled to another one level downward adjustment if he

accepted responsibility in a timely manner thereby permitting the Government to avoid

preparing for trial.  Id. § 3E1.1(b)(2) (Nov. 1, 2002).  The defendant has the burden of

demonstrating, by a preponderance of the evidence, that he is entitled to a downward

adjustment for acceptance of responsibility.  United States v. Spedalieri, 910 F.2d 707,

712 (10th Cir. 1990).  Entering a plea of guilty prior to trial and truthfully admitting the

conduct comprising the offense of conviction constitutes "significant evidence" of

acceptance of responsibility.  U.S.S.G. § 3E1.1 comment. (n.3).  Therefore, "when a

---

[8] Section 401(d) of the PROTECT Act requires that we review a district court's departure from the Guidelines *de novo*.  United States v. Jones, 332 F.3d 1294, 1299-1300 (10th Cir. 2003).  This requirement, however, does not apply here because the district court did not depart from the Guidelines; rather, the court made adjustments to Chavarin's (and his co-defendants') base offense levels in determining the proper Guidelines' range.  See U.S.S.G. § 1B1.1(c),(e),(i) (treating adjustments as distinct from departures); United States v. Stokes, 347 F.3d 103, 107 n.3 (4th Cir. 2003) (noting the court did not need to decide whether the PROTECT Act's amendments to the applicable standard of review applied because the case only involved downward "adjustments" and not "departures").

22

defendant admits the facts necessary to support his conviction, he should generally be awarded a reduction." United States v. Cruz Camacho, 137 F.3d 1220, 1226 (10th Cir. 1998). The Guidelines also provide, however, that "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." Id. § 3E1.1 comment. (n.1(a)).

B.

The Government's argument that Chavarin falsely denied and frivolously contested relevant conduct when he objected to the amount of methamphetamine being attributed to him is unfounded. Chavarin admitted to the drug quantities directly attributable to him. The rules of criminal procedure and Guidelines permit a defendant to object to drug quantities he believes are not attributable to him. Fed. R. Crim. P. 32(i)(2); U.S.S.G. § 6A1.3(a). Thus, Chavarin did not frivolously contest or falsely deny relevant conduct when he simply required the Government to bear its burden of proof. Additionally, the district court never indicated that Chavarin falsely denied or frivolously contested relevant conduct.

We have carefully reviewed the record and have determined it contains sufficient evidence to support the district court's finding that Chavarin was entitled to an acceptance of responsibility adjustment. Early in the proceedings, the Government offered a package plea agreement to Defendants conditioned on each Defendant accepting the agreement.

23

Chavarin accepted the offer. The Government, however, properly withdrew the agreement because one of the Defendants refused to enter into the agreement. Therefore, based on Chavarin's early acceptance of responsibility it was not clear error for the district court to adjust Chavarin's sentence downward. See United States v. Johnson, 956 F.2d 894, 904-905 (9th Cir. 1992).

Moreover, the district court made it clear from the first day of the sentencing hearing that the "issue of acceptance of responsibility is clearly on the table" and that the court would adjust Defendants' sentences either *downward* or *upward* depending on what transpired at the hearing. (R. Vol. 4 at 5). At the end of the hearing, the district court concluded that Chavarin was entitled to the adjustment for timely acceptance of responsibility. In so finding, the district court noted that Chavarin had pled guilty and provided a factual basis for his plea, and cited an application note that supported the acceptance of responsibility finding.[9] We conclude that the district court did not err when

_____

[9] We conclude the district court's findings that Chavarin was entitled to the acceptance of responsibility adjustment but not the two level reduction under the Guidelines' safety valve provisions were not inconsistent. To be entitled to the acceptance of responsibility adjustment "a defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under [the acceptance of responsibility adjustment]." U.S.S.G. § 3E1.1 comment. (n.1(a)). On the other hand, to be entitled to the safety valve provisions the defendant must provide the Government with "all information and evidence that the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan[.]" U.S.S.G. § 5C1.2(a)(5). Thus, for example, Chavarin's plea of guilty to conspiracy to distribute cocaine, but failure to provide the Government with any information regarding the offense, would entitle him to the

(continued...)

it found Chavarin was entitled to a three level downward adjustment for timely acceptance of responsibility.

For the foregoing reasons, the district court's final sentence of Miguel Virgen-Chavarin is

AFFIRMED.

---

[9](...continued) acceptance of responsibility adjustment but not the safety valve reduction.