**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 12, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

DARRYL RAY THORNTON,

      Defendant - Appellant.

No. 04-6137
(D.C. No. 03-CR-145-R)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **EBEL**, **McWILLIAMS** and **KELLY**, Circuit Judges.

---

In this direct criminal appeal, Defendant-Appellant Darryl Ray Thornton

challenges his three forty-eight-month sentences for using a telephone to facilitate

a drug conspiracy. The district court ordered these three sentences to run

consecutively, for a total of 144 months' imprisonment. In imposing this term of

incarceration, the district court, by relying upon court-found facts found by a

preponderance of the evidence to enhance Thornton's sentences, committed

---

[*]This Order and Judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

constitutional Booker[1] error. Because the Government has failed to show that this error was harmless, we REMAND for the district court to vacate Thornton's sentence and resentence him.

## I.  BACKGROUND

A jury convicted Thornton on three counts of using a telephone to facilitate a drug trafficking conspiracy, in violation of 21 U.S.C. § 843(b),[2] but acquitted Thornton of conspiring to distribute drugs and possessing drugs with the intent to distribute.[3][4]  In calculating Thornton's sentence, the district court found that he was responsible for the equivalent of 3,723.3 kilograms of marijuana, which

---

[1] United States v. Booker, 543 U.S. 220 (2005).

[2] Section 843(b) makes it

unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter.  Each separate use of a communication facility shall be a separate offense under this subsection.  For purposes of this subsection, the term "communication facility" means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds and includes mail, telephone, wire, radio, and all other means of communication.

[3] See United States v. Powell, 469 U.S. 57, 62, 59-60 (1984) ("Consistency in the verdict is not necessary.  Each count in an indictment is regarded as if it were a separate indictment.")

[4] The trial court dismissed another possession count at the Government's request.

resulted in a base offense level of thirty-four.[5]  The court then enhanced that

offense level by two, to thirty-six, after finding that Thornton played a managerial

role in the offense.  An offense level of thirty-six combined with Thornton's

criminal history score of II resulted in a guideline range of between 210 and 262

months' imprisonment.  See U.S.S.G. Sentencing Table.  A telephone solicitation

conviction under § 843(b), however, carries a statutory maximum sentence of

only forty-eight months.[6]  See 21 U.S.C. § 843(d).  In light of that, U.S.S.G.

§ 5G1.2(d) required the district court to impose consecutive forty-eight-month

sentences for each of Thornton's three telephone facilitation convictions,

resulting in a total imprisonment of 144 months.[7]  Thornton challenges that

---

[5]The district court applied the 2003 sentencing guidelines to calculate Thornton's sentence.

[6]The sentencing court rejected the Government's assertion that Thornton had a prior state-court conviction that made him subject instead to an eight-year statutory maximum.

[7]"Section 5G1.2 addresses the interplay between statutory maximums and sentences arrived at through application of the Guidelines in sentencing multi-count indictments."  United States v. Lott, 310 F.3d 1231, 1242 (10th Cir. 2002), overruled on other grounds by Booker, 543 U.S. 220 (2005).  Section 5G1.2(d) provides that

> [i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment.  In all other respects sentences on all counts shall run concurrently, except to the extent otherwise required by law.

(continued...)

sentence on several grounds. Having jurisdiction to consider this appeal pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we REMAND to the district court with instructions to vacate Thornton's sentence and resentence him.

## II. STANDARD OF REVIEW

Even after Booker, this court continues to review the legal determinations underlying a district court's sentencing decision de novo and any factual findings for clear error. See United States v. Zunie, 444 F.3d 1230, 1236 (10th Cir. 2006). Because Thornton, at sentencing, unsuccessfully objected under Apprendi v. New Jersey, 530 U.S. 466 (2000), to the trial court's enhancing his sentence based upon a drug quantity found by the sentencing court, this court will review Thornton's constitutional challenge to his sentence de novo. See United States v. Stiger, 413 F.3d 1185, 1191 (10th Cir.), cert. denied, 126 S. Ct. 775 (2005); see also United States v. Glover, 413 F.3d 1206, 1208, 1210 (10th Cir. 2005) (assuming Apprendi objection preserved claim alleging non-constitutional Booker error).

---

[7](...continued)
Further,

> "[t]otal punishment," as defined in the commentary to the Guidelines, means the "combined length of sentences" and "is determined by the adjusted offense level." In other words, the "total punishment" is the sentence arrived at for all counts through application of the Guidelines, including determination of the base offense levels, application of grouping provisions, and calculations of other adjustments.

Lott, 310 F.3d at 1242.

### III.  ANALYSIS

#### A.  Drug quantity used to calculate Thornton's base offense level.

The base offense level for a telephone facilitation conviction is governed by U.S.S.G. § 2D1.6, which directs the district court to apply the base offense level "applicable to the underlying offense."  The district court therefore applied the guideline pertaining to drug trafficking, U.S.S.G. § 2D1.1.  Section 2D1.1 determines a defendant's offense level based upon the type and amount of drugs for which he was responsible.  Because Thornton's offenses involved two different drugs, crack and marijuana, the district court used § 2D1.1's equivalency tables, see § 2D1.1, application note 10, to determine that Thornton was responsible for the equivalent of 3,723.3 kilograms of marijuana.  That amount of marijuana produced a base offense level of thirty-four.  With a two-level increase for Thornton's role in the offense (the validity of which is discussed below, in section III.B) and Thornton's criminal history category of II, the guideline range was 210-262 months' imprisonment.

Had the fact finder, instead, determined that Thornton was responsible for an undetermined amount of crack, his base offense level would have been only twelve.  See U.S.S.G. § 2D1.6, application note 1 (noting § 2D1.1 provides for a minimum base offense level of twelve when the offense involves cocaine or crack).  Adding two levels for Thornton's role in the offense would have resulted in an offense level of fourteen; combined with a Category II criminal history,

Thornton's guideline range would have been eighteen to twenty-four months. See U.S.S.G. Sentencing Table.

Thornton argues that the district court's finding by a preponderance of the evidence of the drug quantity on which his sentence was based amounted to constitutional Booker error.[8] In Booker, the Supreme Court "held that mandatory application of the [federal sentencing] Guidelines violates the Sixth Amendment when judge-found facts, other than those of prior convictions, are employed to enhance a sentence." United States v. Gonzalez-Huerta, 403 F.3d 727, 731 (10th Cir.) (en banc) (citation, quotation, alteration omitted), cert. denied, 126 S. Ct. 495 (2005). In the wake of Booker, there are two distinct errors that are possible: constitutional Booker error, which involves the district court using factual findings it made by a preponderance of the evidence to enhance the defendant's sentence; and non-constitutional Booker error, which involves the district court's applying the federal sentencing guidelines in a mandatory manner. Gonzalez-Huerta, 403 F.3d at 731-32 (citations omitted). "A case involving constitutional error . . . will always involve non-constitutional Booker error as well." United States v. Clifton, 406 F.3d 1173, 1181 (10th Cir. 2005).

_____

[8]Because Thornton filed his opening brief in this appeal before the Supreme Court decided Booker, he asserted this constitutional argument under the precursor to Booker, Blakely v. Washington, 542 U.S. 296 (2004). But "raising his Sixth Amendment issue pursuant to Blakely in his opening brief is sufficient to invoke Booker." United States v. Brooks, 438 F.3d 1231, 1243 (10th Cir. 2006).

Thornton first contends that at trial the jury specifically found, beyond a reasonable doubt, that he was responsible for no drugs. According to Thornton, the district court was bound by that determination at sentencing. We conclude, however, that the jury did not specifically find that Thornton was responsible for no amount of drugs.

The verdict form, in setting forth the conspiracy and possession counts on which the jury acquitted Thornton, did provide spaces where jurors could indicate the type and amount of drugs underlying those offenses. In acquitting Thornton of those charges, the jury left those spaces for drug quantity blank. Thornton contends that those blank spaces mean that the jury actually found that he had not been involved with any drugs. But by the very language of the verdict form, the jurors never had to reach the question of drug quantity. Rather, the verdict form required jurors to find drug quantity only "[i]f you have found the defendant Darryl Ray Thornton guilty of the offense of" conspiracy or possession of drugs with the intent to distribute. Because the jurors did not find Thornton guilty of any of those offenses, they never had occasion to make a finding as to drug quantity. And the verdict form did not require the jury to find drug quantity for the three telephone facilitation charges on which the jury did convict Thornton. Under these circumstances, then, and presuming as we must that the jurors followed the instructions the trial court gave them, see United States v. Almaraz,

306 F.3d 1031, 1037 (10th Cir. 2002), the verdict form does not indicate that the jury specifically found that Thornton was not involved with any drugs at all.

Nevertheless, the district court did commit constitutional Booker error when it enhanced Thornton's offense level from twelve to thirty-four based upon its finding, by a preponderance of the evidence, that Thornton was responsible for the equivalent of 3,723.3 kilograms of marijuana. See Brooks, 438 F.3d at 1243. This error requires resentencing unless the Government can show, beyond a reasonable doubt, that this constitutional error was harmless, see United States v. Waldroop, 431 F.3d 736, 743 (10th Cir. 2005); that is, that the error did not affect Thornton's "substantial rights," Fed. R. Crim. P. 52(a).[9]

> [T]here are at least two ways that a defendant's substantial rights may have been affected in cases of constitutional Booker error [where the sentence falls within the Guideline range]. First, a defendant's substantial rights may be affected if a jury applying a reasonable doubt standard would not have found the same material facts that a judge found by a preponderance of the evidence. Second, a defendant's substantial rights may also be affected if there is a reasonable probability that, under the specific facts of his case as analyzed under

---

[9]Thornton asserts that constitutional Booker error is structural error requiring resentencing. This court, however, has previously rejected such an argument. See United States v. Leach, 417 F.3d 1099, 1103 n.7 (10th Cir. 2005) (rejecting argument that constitutional Booker error is structural error); see also Gonzalez-Huerta, 403 F.3d at 734 (holding non-constitutional Booker error is not structural error).

the sentencing factors of 18 U.S.C. § 3553(a)[10], the district court would reasonably impose a sentence outside the Guidelines range.

United States v. Small, 423 F.3d 1164, 1190 & n.15 (10th Cir. 2005), cert. denied, 126 S. Ct. 1180, 1377, 2050 (2006) (citation, quotation omitted, and footnote, emphasis added).

The Government must show that the constitutional Booker error was harmless beyond a reasonable doubt. See Waldroop, 431 F.3d at 743. In cases where there is only non-constitutional error, this court will instead "review whether the error was harmless by a preponderance of the evidence." United States v. Montgomery, 439 F.3d 1260, 1263 (10th Cir. 2006). But where, as here, there is constitutional as well as non-constitutional error, this court has applied a unitary harmless-beyond-a-reasonable-doubt standard when reviewing both aspects of the Booker error; that is, this court has not subdivided the review standards in those cases between constitutional and non-constitutional error. See Waldroop, 431 F.3d at 743 (concluding constitutional Booker error was harmless beyond a reasonable doubt because there was no reason to believe the district court would impose a different sentence upon remand); see also Small, 423 F.3d at 1190-91 (reviewing to determine whether preserved constitutional Booker error

_____

[10]18 U.S.C. § 3553(a) provides that, in imposing a sentence, the district court should consider such things as the nature and circumstances of the offense; the defendant's history and characteristics; the need for the sentence to reflect the seriousness of the offense; the need for deterrence, public protection and rehabilitation; the kinds of sentences available as well as the applicable sentencing guideline range; and the need to provide victims with restitution.

was harmless beyond a reasonable doubt). In this case, the Government has not shown beyond a reasonable doubt that the constitutional Booker error was harmless, that is, that it did not affect Thornton's substantial rights.

### 1. Whether a jury would find the same drug quantity beyond a reasonable doubt.

The Government has not shown that, had the jury been asked, it would have found, beyond a reasonable doubt, the same drug quantity that the district court found by a preponderance of the evidence. The district court based its drug quantity finding on seven transactions:[11]

### a. March 31, 2003.

The district court found that Thornton was responsible for 7.1 grams of crack he obtained from his co-defendant Kenneth Charles ("K.C.") Brown on March 31, 2003. At trial, the Government played a recording of two telephone

---

[11]"The Guidelines require a sentencing court to consider 'relevant conduct' at sentencing, see U.S.S.G. § 1B1.3, including uncharged drug quantities if they are part of the same conduct for which the defendant was convicted." United States v. Hauk, 412 F.3d 1179, 1195 (10th Cir. 2005) (quotation omitted). Thornton did not challenge at sentencing, and does not challenge now on appeal, that these seven transactions are part of the relevant conduct on which his sentence should be based.

In calculating the relevant drug quantity under the guidelines, U.S.S.G. § 2D1.1 provides that where there is "an agreement to sell a controlled substance," the district court can use the amount agreed upon unless "the defendant establishes that he or she did not intend to provide, or was not reasonably capable of providing, the agreed-upon quantity of the controlled substance." Id., application note 12.

calls[12] made that night between Thornton's girlfriend, Elizabeth Lyons, and

Brown, an admitted drug dealer.[13] During the first call, Thornton can be heard in

the background directing Lyons to ask questions and relay information to Brown.

During that call, Lyons tells Brown they need "one of them." Brown testified that

what Lyons meant by "one of them" was one-quarter ounce, or 7.1 grams, of

crack. During the second call, Lyons told Brown that Thornton had asked her to

call and see if they could get it now. Brown testified that after that second call,

Thornton came over to Brown's home that same evening and bought a quarter

ounce of crack. Police officers followed Thornton and were able to verify that he

did briefly go to Brown's home that night.

The jury found that Thornton had used the telephone on this date to

facilitate a drug transaction, but acquitted him of possessing crack with the intent

to distribute. It may be that jurors acquitted Thornton of possessing the crack

because they did not find Brown's testimony credible.[14] It was only Brown's

---

[12]Neither party has provided this court with the tapes of the telephone calls at issue in this case. We, therefore, rely on the trial testimony describing the contents of these calls.

[13]In this same prosecution, Brown had previously pled guilty to being one of two leaders of a drug trafficking conspiracy involving cocaine, crack, and marijuana.

[14]Alternatively, jurors may have found that Thornton possessed this amount of crack, but did not intend to distribute it. There was conflicting evidence presented at trial on the question of whether Thornton could have been purchasing this amount of crack for personal use instead of intending to resell it. It was

(continued...)

- 11 -

testimony that would have supported the jury finding that Thornton actually

obtained any crack that night. Likewise, it was only Brown's testimony that

would have supported a finding that Thornton's wanting "one of them" meant that

he was specifically seeking to buy a quarter ounce, or 7.1 grams, of crack. If, as

may be the case, the jury did not find Brown's testimony credible as to the fact

---

[14](...continued)
unclear from the evidence whether Thornton even used crack, and if so, how much he used and with what frequency. The evidence did establish that Thornton's girlfriend, Lyons, was a crack addict, but there was again no evidence as to the frequency and amounts she used. During at least one of the taped telephone calls, Lyons commented to Brown about how good the stuff was that Thornton had just obtained from Brown, suggesting that Lyons had used at least some of the crack Thornton had bought from Brown. Brown testified that a person could individually use the amount of crack Thornton purchased from him, although Brown believed Thornton was instead reselling it to his own customers.

On the other hand, several Government witnesses testified that, in their experience with crack addicts, one-quarter ounce of crack was too large a quantity for personal use and so Thornton must have been purchasing this amount of crack for resale. Further, there are several references during the taped telephone calls indicating that Thornton had customers to whom he was going to sell the crack he obtained from Brown. The Government, however, was unable to produce any evidence tending to prove that Thornton actually did resell any of the crack.

The evidence, then, was disputed as to whether or not Thornton could have himself used all the crack he purportedly purchased from Brown, or instead whether he resold most of that crack to his own customers. So it may be that the jury acquitted Thornton of possessing the crack on March 31 because the Government did not prove beyond a reasonable doubt that Thornton actually possessed the crack. On the other hand, the jury may have acquitted Thornton of possessing the crack with the intent to distribute because the Government failed to prove that Thornton intended to distribute the crack instead of use it personally. In light of that ambiguity, the Government cannot meet its burden on appeal of establishing that a jury, had it been asked, would have found, beyond a reasonable doubt, that Thornton obtained 7.1 grams of crack on March 31, 2003.

that Thornton actually bought crack from Brown that night, then there is no reason to think that the jury would, nevertheless, have found Brown's testimony credible as to the amount of crack that was being discussed over the telephone. At a minimum, then, the evidence is sufficiently equivocal that the Government cannot establish, beyond a reasonable doubt, that the jury, had it been asked, would have found Thornton responsible for a transaction involving 7.1 grams of crack on this date.

### b.    April 3, 2003.

The district court next found that Thornton was responsible for a transaction involving one-quarter ounce, or 7.1 grams, of crack occurring on April 3, 2003. At trial, the Government played recordings of four calls occurring on this date involving Lyons, Thornton and Brown. According to Brown, during the first call, Thornton asked to buy some crack, but Brown did not have any available to sell.[15] Lyons called Brown twice more that night, on Thornton's behalf, to see if Brown had been able to obtain any more crack. All Brown had available were "rocks," just pieces of crack in quantities smaller than a quarter ounce. Brown testified that he went by the Lyons/Thornton residence that night and sold them what crack he had left for $140. (According to Brown, Thornton

---

[15]Brown equivocated throughout his testimony. For example, while Brown testified on direct examination that Thornton was calling to see if he could buy some crack, on cross-examination Brown testified instead that he did not know if that conversation actually involved crack.

ordinarily paid $200 for a quarter ounce of crack.)  Brown testified on direct examination that the amount he distributed to Thornton on this night was actually $300's worth of crack, which would presumably be more than a quarter ounce; but on cross-examination, Brown testified instead he sold Thornton less than one-quarter ounce that night.

Again, it is only Brown's testimony that indicates that Thornton was specifically trying to buy a quarter ounce of crack.  Further, Brown's own testimony is inconsistent as to the amount Brown purportedly sold Thornton. Therefore, the Government has not shown that a jury would have found beyond a reasonable doubt that Thornton was responsible for a quarter ounce, or 7.1 grams, of crack on April 3.

### c.     April 6, 2003.

On April 6, 2003, police intercepted a call between Thornton and Brown, during which Brown asked Thornton if he had some "green" to sell Brown. Brown explained at trial that when he used the term green, he meant marijuana. (Brown testified that he had previously purchased "a little sack" of marijuana from Thornton, worth $20 to $30.)  During this April 6 call, Thornton replied that he only had a "zip," or one ounce of marijuana.  Thornton went on, however, to tell Brown that Thornton's "people would be back the following morning" with more; it would cost $ 425 a pound, if Brown bought five pounds or more; and Thornton's people should have between "twenty and eighty."  Brown testified that

that meant Thornton's supplier would have between twenty and eighty pounds of marijuana available to sell the next day. Brown told Thornton he wanted all of it. It is undisputed, however, that Brown never obtained any marijuana from Thornton on this occasion, either by buying it directly from Thornton, or having Thornton broker a transaction between Brown and Thornton's "people." Based upon this call, the jury convicted Thornton of using the telephone to facilitate a drug transaction. In sentencing Thornton, the district court found that he was responsible for eighty pounds of marijuana stemming from this telephone call.

In calculating the relevant drug quantity under the guidelines, U.S.S.G. § 2D1.1 provides that where there is "an agreement to sell a controlled substance," the district court can use the amount agreed upon unless "the defendant establishes that he or she did not intend to provide, or was not reasonably capable of providing, the agreed-upon quantity of the controlled substance." Id., application note 12. There appear to be at least two problems with the evidence supporting a factual finding that Thornton had agreed to, and was capable of, arranging for Brown to purchase eighty pounds of marijuana.

First, it is not at all clear that Thornton and Brown ever reached an agreement regarding this marijuana purchase. Most importantly for our purposes, Brown and Thornton never settled on an amount. Rather, they discussed Brown's buying between twenty and eighty pounds, whatever Thornton's supplier had available the next day. For that reason, the Government has not shown beyond a

reasonable doubt that a jury, had it been asked, would have found that Thornton agreed to provide Brown with eighty pounds of marijuana.

Secondly, there is no evidence in the record suggesting that Thornton was actually capable of providing Brown with that much marijuana. Brown testified at trial that he had previously bought marijuana from Thornton, but only in much smaller amounts. Further, Robert Ryan, an agent with the Drug Enforcement Agency, testified at Thornton's sentencing hearing that Thornton was always trying to broker bigger drug deals, but that these deals would inevitably fall through and never actually occur. And while Agent Ryan also testified that he believed Thornton could have pulled off this deal, the evidence is sufficiently equivocal such that the Government has not shown that a jury, had it been asked, would have found beyond a reasonable doubt that Thornton was responsible for eighty pounds of marijuana resulting from this negotiation.

### d.     April 7, 2003.

The district court also found that Thornton was responsible for 7.1 grams of crack based upon a call between Lyons and Brown occurring on April 7, 2003. Several calls involving Lyons, Thornton and Brown occurred on this date. During one of these calls, Lyons told Brown that Thornton wanted "two." According to Brown, that meant Thornton wanted to buy two quarter ounces of crack. In a later call, Brown told Thornton to come and get it. Brown testified that as a result of this call, Thornton went to Brown's residence, where Brown sold Thornton one

quarter ounce, or 7.1 grams, of crack. It is again only Brown's testimony, which the jury may not have found credible, that establishes the amount of crack that he sold Thornton on that date. In addition, Brown's own testimony about the amount is inconsistent. In light of that, there does not appear to be a reasonable probability that a jury would have found, beyond a reasonable doubt, that Thornton was responsible for one-quarter ounce, or 7.1 grams, of crack on this date.

### e. April 13, 2003.

The district court also found that Thornton was responsible for another 7.1 grams of crack based upon a telephone call occurring on April 13, 2003 between Thornton and Brown. During this call, Thornton told Brown he was "ready," meaning, according to Brown, that Brown should come by with more crack. Brown testified that later that same day, Brown sold Thornton one-quarter ounce of crack. Police were able to verify that Brown went to the Lyons/Thornton residence briefly on that date. But at trial, the jury acquitted Thornton both of using a telephone on this date to facilitate a drug transaction and of possessing crack with the intent to distribute. It appears clear, then, that the jury, had it been asked, would not have found beyond a reasonable doubt that Thornton was responsible for 7.1 grams of crack on this date.[16]

---

[16]Of course, on remand, the district court, treating the Guidelines as only advisory, may still find sentencing facts by a preponderance of the evidence. See

(continued...)

### f.    April 22, 2003.

The district court found that Thornton was responsible for one ounce of crack on this date, based upon a telephone conversation between Thornton and Brown. According to Brown, during this call, Thornton wanted to buy an ounce of crack on behalf of "Richard," who would pay $800 for that ounce. Again, the only evidence of the quantity involved in this transaction comes from Brown, who the jury may not have found to be credible. Further, although Brown testified at trial that Thornton was trying to buy an entire ounce of crack, four times what Brown asserted Thornton would ordinarily buy, Brown had previously told police that he had never sold Thornton more than a quarter ounce of crack at any one time. In light of this equivocal evidence and the jury's possible disbelief of Brown's testimony, the Government has not shown that a jury would have found beyond a reasonable doubt that Thornton was responsible one ounce of crack on this date.

### g.    April 23 and 24, 2003.

The district court found that Thornton was responsible for 4.5 ounces of crack stemming from a series of telephones calls occurring over this two-day

---

[16](...continued)
United States v. Dalton, 409 F.3d 1247, 1252 (10th Cir. 2005). And in making those sentencing findings, the district court is not bound by the jury's acquittal verdict, made under "the more onerous reasonable doubt standard." United States v. Serrata, 425 F.3d 886, 920 (10th Cir. 2005); see also United States v. Magallanez, 408 F.3d 672, 683-85 (10th Cir.) (applying United States v. Watts, 519 U.S. 148 (1997), post-Booker), cert. denied, 126 S. Ct. 468 (2005).

period of time. According to Brown, these telephone conversations focused on Thornton's attempts to purchase, for someone else, nine ounces of crack, a much larger amount than Brown had ever before sold Thornton. Brown told Thornton he did not have that much readily available, but to check back with him later. Brown was eventually able to acquire nine ounces of crack, but was only willing to sell Thornton half of that amount, or 4.5 grams. Ultimately, Thornton bought only his usual one-quarter ounce.

The district court, nevertheless, found that Thornton was responsible for 4.5 ounces of crack. Once again, however, this amount is based only upon Brown's testimony, which the jury may have found to be incredible generally. In addition, Brown testified that he had previously told police he had never sold Thornton any amount of crack larger than a quarter ounce at any one time. Even assuming this deal was originally for nine, and then later 4.5 ounces, of crack, and although the substance of the conversations indicates it was actually Brown who was having trouble finding enough crack to conduct this transaction, the evidence is disputed as to whether Thornton himself could have actually conducted this transaction. According to Brown, Thornton had never before purchased this much crack. And when Brown eventually offered to sell Thornton at least 4.5 ounces, Thornton backed down and just bought what Brown characterized as Thornton's usual amount–one-quarter ounce. Further, although Thornton told Brown that he intended to show this quarter ounce to his customers

to determine if they were still interested in buying more, there is no indication that Thornton ever tried to conduct or broker a later sale. Again, based upon the equivocal nature of this evidence, the Government cannot show that a jury would have found beyond a reasonable doubt that Thornton was responsible for 4.5 ounces of crack stemming from this two-day transaction.

### h. Conclusion.

The district court found, by a preponderance of the evidence, that Thornton was responsible for the equivalent of 3,723.3 kilograms of marijuana, based upon the above-referenced seven incidents. However, because of the disputed and tenuous nature of the evidence supporting that drug quantity, the Government is unable to show on appeal that a jury would have found these same sentencing facts beyond a reasonable doubt. Therefore, the trial court's constitutional Booker error did affect Thornton's substantial rights and he is entitled to resentencing.

> **2. Whether the district court, now treating the Guidelines as advisory and considering 18 U.S.C. § 3553(a)'s factors, is likely on remand to impose a sentence outside the guideline range.**

Although we need not further address whether the district court, in treating the guidelines as advisory and considering § 3553(a)'s factors, would on remand impose a sentence outside the guideline range, see Small, 423 F.3d at 1190-91 (noting "[t]his court need not even reach the second . . . alternative if it concludes

that a jury likely would not have found the quantity of drugs required for [the defendant's] sentence beyond a reasonable doubt"), there is a reasonable probability that the court would do so on remand.

Among the § 3553(a) factors that the district court will have to consider on remand are the need to avoid sentencing disparity among similarly historied defendants, the need to promote respect for the law and to provide just punishment, the kinds of sentences available, and the nature of the offense. See 18 U.S.C. § 3553(a)(1), (2)(A), (3), (6). Under the mandatory guideline regime, the district court had to impose Thornton's three sentences consecutively, resulting in a 144-month term of imprisonment. See U.S.S.G. § 5G1.2(d). On remand, however, this will not be required since the Guidelines are no longer mandatory. Further, while the jury at trial acquitted Thornton of being a part of Brown's drug trafficking conspiracy and of possessing any crack with the intent to distribute it, Brown, the admitted leader of that conspiracy, received a 146-month sentence after pleading guilty to conspiracy to distribute drugs. The fact that both Thornton and Brown received practically the same sentence whereas arguably Brown was more culpable may provide a basis under the § 3553(a) factors for the district court to resentence Thornton outside the advisory guideline range, although the sentencing calculation may take into account each of these men's prior convictions, the fact that Brown pled guilty, accepting responsibility for his offenses, and cooperated with the Government by testifying against his

co-defendants.  Therefore, because there is a reasonable probability that the district court, on remand, will impose a lighter sentence outside the advisory guideline range, Thornton is entitled to resentencing on this basis as well.

### 3. Conclusion.

The Government has failed to show that the constitutional Booker error occurring during Thornton's sentencing did not affect his substantial rights.  Therefore, Thornton is entitled to be resentenced.  Because, on remand, the district court will still have to consider the advisory Guidelines before imposing a new sentence, we will address Thornton's remaining issues.[17]

### B. Role in the offense.

Thornton argues that the district court erred in denying him a decrease in his offense level because he played only a minimal or minor role in the offense.  The district court, instead of decreasing Thornton's offense level, actually increased it by two after finding, instead, that Thornton played a managerial or supervisory role in the offense.  See U.S.S.G. § 3B1.1(c).  The district court based this two-level increase on the court's finding that Thornton directed Lyons to

---

[17]Thornton argues that applying the remedial Booker holding, requiring the district court on remand to treat the Guidelines as advisory, will violate Ex Post Facto principles; that is, Thornton asserts that he is "entitled to the benefit of [Booker's] Sixth Amendment holding . . . , but cannot be disadvantaged by retroactive application of [its] remedial opinion."  We have, however, previously rejected such an argument.  See United States v. Rines, 419 F.3d 1104, 1106 (10th Cir. 2005), cert. denied, 126 S. Ct. 1089 (2006).

make some of the calls to Brown on Thornton's behalf.[18] See U.S.S.G § 3B1.2(a) and (b). Thornton now argues that the district court's factual finding that Thornton did not play a minimal or minor role was clearly erroneous. See United States v. Virgen-Chavarin, 350 F.3d 1122, 1130-31 (10th Cir. 2003) (reviewing district court's refusal to apply downward adjustment for defendant's role in the offense for clear error). We disagree.

Section 3B1.2 "provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." Id., application note 3(A). The four-level decrease for one who is a minimal participant applies to

> defendants who are plainly among the least culpable of those involved in the conduct of the group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant. It is intended that the downward adjustment for a minimal participant will be used infrequently.

---

[18]On appeal, Thornton argues that the district court, in finding by a preponderance of the evidence that Thornton played a managerial role in the offense and then using that finding to enhance his offense level, again committed constitutional Booker error. We agree. But because Thornton did not raise an Apprendi objection to this enhancement at sentencing, we review this constitutional error only for plain error. See United States v. Apperson, 441 F.3d 1162, 1212 (10th Cir. 2006). And because, as discussed below, there is plenty of evidence in the record from which a jury would have found, beyond a reasonable doubt, that Thornton played a managerial role, Thornton is not able to meet his burden, under a plain-error analysis, of establishing that this constitutional Booker error affected his substantial rights. See id.

Id., application note 4. And the two-level decrease in an offense level for a defendant who is a minor participant applies "to a defendant . . . who is less culpable than most other participants, but whose role could not be described as minimal."[19] Id., application note 5. "A defendant has the burden of establishing, by a preponderance of the evidence, that he is entitled to a reduction in his base offense level under § 3B1.2." Virgen-Chavarin, 350 F.3d at 1131 (quotation, alteration omitted).

The focus of the inquiry concerning a defendant's role in the offense is on "the defendant's knowledge or lack thereof concerning the scope and structure of the enterprise and of the activities of others in the offense." United States v. Salazar-Samaniega, 361 F.3d 1271, 1277 (10th Cir.) (quotation omitted), cert. denied, 543 U.S. 859 (2004). Further, "[a] defendant is not entitled to a minimal participant adjustment if he plays a 'significant role' in facilitating a drug trafficking scheme," including orchestrating the sale of drugs. Virgen-Chavarin, 350 F.3d at 1131. "The defendant's own assertion that he was a minimal participant is not enough to overcome the clearly erroneous standard." Id.

In this case, the evidence indicated that Thornton made numerous telephone calls arranging drug transactions in which he was, at times, both the buyer and the

---

[19]In this case, even a two-level reduction would have significantly affected Thornton's offense level because § 2D1.1(a)(3) provides that if "the defendant receives an adjustment under § 3B1.2 (Mitigating Role), the base offense level under this subsection shall not be more than level **30**." (Emphasis in original.) Thornton's base offense level, instead, was thirty-four.

seller, or at least the broker of a potential sale. Even when it was Lyons, rather than Thornton, who called Brown to arrange a drug transaction, the evidence indicated either that Thornton was in the background directing Lyons's conversation with Brown, or that Thornton had asked Lyons to make the call on his behalf. And the drug transactions resulting from Lyons's calls were always conducted between Brown and Thornton. In light of this evidence, we cannot conclude that the district court's finding that Thornton was more than a minimal or minor participant was clearly erroneous.

## IV.  CONCLUSION

For these reasons, we REMAND this case to the district court with directions to VACATE Thornton's sentence and resentence him.

Entered for the Court

David M. Ebel
Circuit Judge