**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 4, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

v.

PHILLIP ARCHULETA,

Defendant - Appellee.

No. 06-2251

D. NM

(D.C. No. CR-01-829 MV)

**ORDER AND JUDGMENT**[*][1]

Before **BRISCOE**, **MURPHY**, and **O'BRIEN**, Circuit Judges.

Phillip Archuleta proceeded to trial for possession with intent to distribute

fifty grams and more of actual methamphetamine and carrying a firearm during

and in relation to a drug trafficking crime. After the government rested its case,

the court granted Archuleta's motion for judgment of acquittal on the firearm

charge; the jury found him guilty of the drug charge. Archuleta was sentenced to

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

[1] We provisionally sealed all matters in this appeal and excused the parties
from submitting briefs via e-mail. While we order the briefs and appendices to
remain sealed, we decline to seal this decision.

51 months imprisonment after the district court concluded, *inter alia*, he was entitled to (1) safety-valve relief, (2) a reduction in his offense level for being a minor participant and (3) a downward variance under 18 U.S.C. § 3553(a). The government appeals from that sentence. Because we conclude the court erred in determining Archuleta was entitled to safety-valve relief and a minor participant reduction, we reverse and remand for re-sentencing.

## I. FACTUAL BACKGROUND

On June 4, 2001, Ronnie Enriquez, accompanied by Archuleta, sold a pound of methamphetamine to undercover officer Matthew Gonzales for $5,700. Eight days later, Gonzales paged Enriquez seeking to purchase an additional two pounds of methamphetamine. Enriquez informed him he could not sell him the methamphetamine but could send his "bro," Archuleta. (R. Vol. I at 138.) When Gonzales said he did not want to deal with a new person, Enriquez responded by telling Gonzales to call him the next day.

The next day, June 13, 2001, Enriquez again told Gonzales he could not provide the drugs. Gonzales eventually agreed to deal with Archuleta and asked Enriquez whether Archuleta would accept $11,000 for two pounds of methamphetamine. Enriquez told Gonzales he would check with Archuleta and call him back; Enriquez subsequently informed him Archuleta would accept $11,200. Gonzales agreed to this price and told Enriquez to have Archuleta meet him at a grocery store parking lot at 7:00 P.M.

A little before 7:00 P.M., Gonzales, along with undercover officer Kevin Perno, arrived at the parking lot.  Gonzales then received a telephone call from Enriquez inquiring about his whereabouts.  Gonzales told Enriquez he was at the grocery store parking lot and described his vehicle.  A few minutes later, Archuleta drove up and parked his vehicle on the passenger side of the undercover vehicle, two to three yards away.  Archuleta motioned to Gonzales to enter his vehicle; Gonzales shook his head and motioned to Archuleta to enter the undercover vehicle.  Archuleta entered the undercover vehicle through the passenger side rear door and handed Gonzales two pounds of methamphetamine.  Gonzales pulled out money and began counting it.  Gonzales, who was wired, gave the arrest signal to officers conducting surveillance.  Subsequently, a number of officers approached the vehicle with their weapons drawn and arrested Archuleta.  A search of Archuleta's vehicle revealed another pound of methamphetamine underneath the driver's seat and a loaded .380 semiautomatic pistol in the center console.

After his arrest, Archuleta waived his rights and agreed to speak with law enforcement officials.  Archuleta told them he obtained the three pounds of methamphetamine involved in the offense from Marco Sanchez.  He admitted he had been selling methamphetamine since August 2000 and had purchased four to five pounds of methamphetamine per week from Sanchez at a cost of $4-5,000 per pound.  Archuleta also stated he intended to break up the one pound of

methamphetamine found under the front seat of his vehicle and sell it. When asked about the firearm found in his vehicle, Archuleta said he purchased it in January or February 2001 to protect himself from being car-jacked due to the expensive gold rims and tires he had on his vehicle. In Archuleta's wallet, officers discovered a receipt dated April 19, 2001, for rims and tires totaling $3,000.

## II. PROCEDURAL BACKGROUND

On June 26, 2001, the government indicted Archuleta with conspiracy to distribute more than 500 grams of methamphetamine in violation of 21 U.S.C. § 846 (Count I), distribution of more than 500 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) and 18 U.S.C. § 2 (Count III), possession with intent to distribute fifty grams and more of methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) (Count IV) and carrying a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A) (Count V). In the same indictment, Enriquez was named in Counts I and III and also charged with distribution of more than fifty grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) (Count II). On November 4, 2002, Archuleta pled guilty to Counts I and V. Pursuant to the plea agreement, the parties agreed to a total sentence of fifteen years imprisonment, which constituted the mandatory minimums for Counts I (ten years) and V (five years). However, at the plea hearing, defense counsel informed the court the

government might later file a motion to reduce the agreed upon sentence based on Archuleta's substantial assistance. *See* Fed. R. Crim. P. 35(b).

Thereafter, Archuleta began assisting Agent Frank Chavez, who was employed by the Bernalillo County Sheriff's Department but assigned to the Drug Enforcement Administration's (DEA) Task Force. Archuleta met with Chavez in late 2002 and was officially approved as a DEA informant in January 2003. Archuleta met with Chavez ten to twelve times and provided him information concerning several mid-level and upper-level drug traffickers in New Mexico. In March 2003, however, Chavez terminated Archuleta as an informant when Archuleta proposed robbing a drug trafficker and splitting the money.

In June 2003, the government allegedly informed Archuleta it would file a motion for downward departure under USSG §5K1.1 and 18 U.S.C. § 3553(e) based on his substantial assistance. Later, when the motion was not filed, Archuleta learned the government no longer deemed his assistance substantial. He then filed a motion to compel the government to file a motion for downward departure under USSG §5K1.1 and § 3553(e). After a hearing, the court denied the motion and proceeded to sentencing. Concerned, however, that the plea agreement did not allow Archuleta to appeal the denial of the motion to compel, the court postponed sentencing to give Archuleta time to decide whether to proceed under the plea agreement or seek to withdraw his guilty plea. Thereafter, Archuleta filed a motion to withdraw his guilty plea; the court denied the motion

because Archuleta had not demonstrated a fair and just reason for allowing him to withdraw.

On August 3, 2005, Archuleta appeared for sentencing and asked the court to reject his plea. The court granted the request: "It is a very legitimate request. [Fifteen] years is an awfully long time. And the circumstances are very compelling." (R. Vol. III at 898.) Thereafter, the government filed a four-count superseding indictment against Archuleta only,[2] charging him with conspiracy to possess with intent to distribute fifty grams and more of actual methamphetamine in violation of 21 U.S.C. § 846 (Count I), two counts of possession with intent to distribute fifty grams and more of actual methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) (Counts II and III) and carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count IV). The court subsequently granted the government's motion to dismiss Counts I and II.

Archuleta proceeded to trial. At the close of the government's evidence, the court granted Archuleta's motion for judgment of acquittal on the firearm charge (Count IV).[3] The jury found Archuleta guilty on Count III. A presentence

---

[2] Enriquez had already pled guilty to Count I of the original indictment and had been sentenced to 56 days imprisonment (time served).

[3] The government may not appeal from a court's pre-verdict judgment of acquittal. *See* 18 U.S.C. § 3731; *Smith v. Massachusetts*, 543 U.S. 462, 466-67 (2005).

report ("P.S.R.") was prepared.[4]  Because the offense involved at least 150 grams but less than 500 grams of actual methamphetamine, the PSR calculated the base offense level as 34.  *See* USSG §2D1.1(c)(3).  The PSR applied a two-level enhancement for possession of a dangerous weapon, resulting in an adjusted offense level of 36.  *See* USSG §2D1.1(b)(1).  It declined to impose an "acceptance of responsibility" or "role in the offense" adjustment.  Based on a total offense level of 36 and a Criminal History Category of I, the advisory guideline range was 188 to 235 months imprisonment.  The PSR also noted Count III carried a mandatory minimum sentence of ten years imprisonment.  *See* 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii).

Archuleta filed a number of objections to the PSR, as well as a sentencing memorandum and a motion to compel the government to file a motion for downward departure under USSG §5K1.1 based on his substantial assistance.  He objected to the two-level enhancement for possession of a dangerous weapon and claimed he was entitled to reductions for his mitigating role in the offense and acceptance of responsibility.  He also sought a downward departure based on his assistance to the government, his "'super'" acceptance of responsibility, the extreme disparity between his sentence and Enriquez's, the fact he was abandoned by his mother at a young age, imperfect entrapment and a combination of these

---

[4] Archuleta was sentenced pursuant to the 2005 edition of the United States Sentencing Commission Guidelines Manual.  All citations to the guidelines in this opinion refer to the 2005 guidelines unless otherwise indicated.

factors. (R. Vol. II at 508.) In his sentencing memorandum, he relied on these same factors, as well as his exceptional efforts at rehabilitation, his young age at the time of the offense and his susceptibility to prison violence due to his youthful appearance, to claim he was entitled to a downward variance under the 18 U.S.C. § 3553(a) factors.[5] He further argued he was safety-valve eligible and the court should fashion a sentence without regard to the mandatory minimum sentence. The government opposed these arguments.

At sentencing, the court determined Archuleta was eligible for safety-valve relief. It overruled Archuleta's objection to the possession of a dangerous weapon enhancement (USSG §2D1.1(b)(1)), concluding he had not met his burden of showing it was clearly improbable that the firearm was connected with the offense. However, the court concluded Archuleta was entitled to a three-level reduction and a two-level downward adjustment under USSG §2D1.1(a)(3)(ii) and §3B1.2(b), respectively, because he was a minor participant. It further determined Archuleta was entitled to a three-level downward adjustment for acceptance of responsibility. Based on these conclusions, the total offense level was 26, which, with a Criminal History Category of I, resulted in an advisory

---

[5] A departure occurs "when a court reaches a sentence above or below the recommended Guidelines range through application of Chapters Four or Five of the Sentencing Guidelines." *United States v. Atencio*, 476 F.3d 1099, 1101 n.1 (10th Cir. 2007). A variance occurs "[w]hen a court enhances or detracts from the recommended range through application of § 3553(a) factors." *Id.*

guideline range of 63 to 78 months imprisonment.[6]  The court then reviewed the §

3553(a) factors.  Relevant here, in addressing the need to avoid unwarranted

disparity under § 3553(a)(6), the court noted the significant discrepancy between

Enriquez's sentence (56 days) and Archuleta's.  In the end, the court determined a

sentence within the advisory guideline range was not reasonable and sentenced

Archuleta to 51 months imprisonment.  The government appeals.

## II. DISCUSSION

We review sentences imposed post-*Booker* for reasonableness.  *United*

*States v. Kristl*, 437 F.3d 1050, 1053 (10th Cir. 2006) (citing *United States v.*

*Booker*, 543 U.S. 220 (2005)).  In determining whether a sentence is reasonable,

we first consider whether the court correctly calculated the applicable guideline

range, reviewing its legal conclusions de novo and its factual findings for clear

error.  *Id.* at 1054.  If the court correctly determined the guideline range and the

defendant is sentenced within that range, the sentence is presumptively

reasonable.  *Id.*  The defendant may rebut this presumption by demonstrating the

sentence is unreasonable in light of the sentencing factors set forth in 18 U.S.C.

---

[6] The total offense level of 26 was calculated as follows:  the base offense
level of 34 was (1) reduced three-levels under USSG §2D1.1(a)(3) based on
Archuleta being a minor participant under USSG §3B1.2, (2) enhanced two-levels
under USSG §2D1.1(b)(1) for possession of a dangerous weapon, (3) reduced
two-levels under USSG §2D1.1(b)(7) based on Archuleta being safety-valve
eligible, (4) reduced two-levels under USSG §3B1.2(b) based on Archuleta being
a minor participant and (5) reduced three-levels under USSG §3E1.1 for
acceptance of responsibility.

§ 3553(a). *Id.* at 1055. If, however, the court errs in applying the guidelines, we must remand—without reaching the question of reasonableness—unless the error is harmless. *Id.* at 1054-55.

The government argues the district court erred in applying the guidelines in two respects: (1) concluding Archuleta was safety-valve eligible under USSG §5C1.2(a) (which is codified at 18 U.S.C. § 3553(f)) and (2) concluding Archuleta was a minor participant under USSG §3B1.2 and therefore reducing his offense level a total of five levels (three levels under USSG §2D1.1(a)(3) and two levels under USSG §3B1.2). The government further claims the court erred in applying the 18 U.S.C. § 3553(a) factors, specifically, in considering the disparity in Archuleta and Enriquez's sentences. We conclude the court erred in applying the guidelines and those errors were not harmless. Therefore, we remand for re-sentencing on that basis and do not reach the government's § 3553(a) argument.

A. Safety-Valve Relief

The government argues the district court erred in concluding Archuleta was safety-valve eligible based on its determination that Archuleta did not possess the firearm found in his vehicle "in connection with the offense." *See* USSG §5C1.2(a)(2). We review a district court's determination that a defendant is eligible for safety-valve relief for clear error, giving due deference to its application of the sentencing guidelines to the facts. *United States v. Zavalza-Rodriguez*, 379 F.3d 1182, 1184 (10th Cir. 2004); *United States v. Gonzalez-*

*Montoya*, 161 F.3d 643, 651 (10th Cir. 1998). "A finding of fact is clearly erroneous if it is without factual support in the record or if the appellate court, after reviewing all the evidence, is left with a definite and firm conviction that a mistake has been made." *United States v. Graham*, 413 F.3d 1211, 1218 (10th Cir.) (quotations omitted), *cert. denied*, 546 U.S. 1008 (2005). However, to the extent the court interpreted either the scope or meaning of the safety-valve provision, we review its interpretation de novo. *Zavalza-Rodriguez*, 379 F.3d at 1184; *Gonzalez-Montoya*, 161 F.3d at 651.

Under USSG §5C1.2(a), a court may sentence a defendant convicted under 18 U.S.C. § 841 without regard to any mandatory minimum sentence if the defendant proves by a preponderance of the evidence: (1) he does not have more than one criminal history point, (2) he did not use violence or credible threats of violence or possess a firearm or other dangerous weapon in connection with the offense, (3) the offense did not result in death or serious bodily injury to any person, (4) he was not an organizer, leader, manager or supervisor of others in the offense and was not engaged in a continuing criminal enterprise and (5) before sentencing, he truthfully provided to the government all information and evidence he has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan. *United States v. Virgen-Chavarin*, 350 F.3d 1122, 1129 (10th Cir. 2003). The sole issue is whether the court erred in

concluding Archuleta satisfied the second criterion, *i.e.*, that he did not possess a firearm in connection with the offense.[7]

In determining Archuleta had satisfied his burden, the district court stated:

Under the Tenth Circuit law, the term "'in connection with'" is analogous to the phrase "'during and in relation to,'" as that phrase is used in [18 U.S.C. §] 924(c)(1), the statutory section that creates an offense for the use of a firearm during and in relation to a drug trafficking offense, or other crime of violence.

At trial in this case, I ruled that the evidence did not support a finding that the firearm possessed by [Mr. Archuleta] at the time of the offense was used/carried during/in relation to the offense. Likewise, I now find that the evidence . . . does not support a ruling that [Mr. Archuleta] possessed the firearm at issue in connection with the drug trafficking offense. [Mr. Archuleta] has met his burden and shown by a preponderance of the evidence that the firearm at issue was not used in connection with the drug trafficking offense.

Aside from the fact that [Mr. Archuleta] had a firearm in his car at the time of the offense, there is absolutely no evidence . . . to suggest that the weapon was connected with the offense.

The only evidence . . . on this issue shows that the gun, in fact, was not connected with the [offense.] Specifically, the evidence at trial indicated that immediately following his arrest, Mr. Archuleta

---

[7] The fact the district court enhanced Archuleta's sentence for possession of a firearm under USSG §2D1.1(b)(1) did not preclude it from simultaneously concluding he did not possess a firearm in connection with the offense under USSG §5C1.2(a)(2). That is because USSG §2D1.1(b)(1) only requires proximity to the weapon, *i.e.*, constructive possession, whereas USSG §5C1.2(a)(2) requires active possession. Moreover, the evidentiary burdens are different. Under USSG §2D1.1(b)(1), once the government demonstrates a firearm was possessed, the defendant must then show it is clearly improbable the firearm was not connected to the offense. Under USSG §5C1.2(a)(2), on the other hand, the defendant bears the sole burden of establishing by a preponderance of the evidence he did not possess a firearm in connection with the offense. *See United States v. Zavalza-Rodriguez*, 379 F.3d 1182, 1185-88 (10th Cir. 2004).

provided law enforcement with information related to the drug transaction. A law enforcement officer that testified at trial described Mr. Archuleta as being very cooperative. Mr. Archuleta told the agents about the methamphetamine that he had in the car. He told the agents what he intended to do with the methamphetamine in the car. He told the agents the name of the person who provided him the methamphetamine. He told the agents where he had picked up the methamphetamine. He told the agents about other drug transactions that he was involved with, and he told the agents how much he had paid for the drugs that he had received.

Mr. Archuleta made all of these admissions at the time of his interview. However, he did not state that the firearm in the car was for . . . his use during the drug transaction. Rather, he explained that he had the firearm, which he left in the car, to protect himself from being carjacked, because he had very expensive gold rims on his car.

Moreover, the Government's evidence showed that at the time of the sale, [Mr. Archuleta] left the firearm in the console of his car. If the firearm had been connected to [his] drug trafficking activity, it is unlikely that he would have left the gun in the console of his car, while he went alone into another vehicle with two biker-clad men [(the undercover officers)], to conduct this drug transaction.

(R. Vol. III at 865-67.) The court clearly erred in concluding Archuleta satisfied the second criterion for safety-valve relief.

The "in connection with" requirement is analogous to the "in relation to" requirement of 18 U.S.C. § 924(c)(1). *United States v. Walters*, 269 F.3d 1207, 1219 (10th Cir. 2001) (applying USSG §2K2.1(b)(5) which enhances a defendant's base offense level if he used or possessed a firearm "in connection with another felony offense") (quotations omitted). The "in relation to" requirement of § 924(c)(1) is satisfied if the firearm "facilitates or has the potential to facilitate the offense but is not satisfied if the weapon's possession is coincidental or entirely unrelated to the offense." *Id.* (quotations omitted). Thus,

"a firearm's proximity and potential to facilitate the offense is enough to prevent application of [USSG §5C1.2(a)(2)]." *United States v. Hallum*, 103 F.3d 87, 89 (10th Cir. 1996).

*Hallum* is instructive. There, the defendants were arrested when they carried duffle bags containing fresh marijuana from a marijuana patch to their vehicles 200 to 300 yards away. Officers found a rifle in one of the vehicles; Hallum admitted he owned the firearm and claimed he brought it to shoot snakes. The district court rejected the defendants' argument that they were entitled to safety-valve relief because they did not possess the firearm in connection with the offense. 103 F.3d at 89. It rejected Hallum's reason for the rifle, concluding that if the defendants intended to use it to protect themselves from snakes, they would not have left the rifle in the vehicle. *Id.* It also determined the rifle was possessed in connection with the offense because it was close to the marijuana patch, accessible and the defendants were carrying the marijuana to the rifle's location. *Id.* We affirmed, concluding the evidence established proximity and the firearm's potential to facilitate the offense. *Id.*

Similarly, both proximity and the potential to facilitate the offense are present in this case. The firearm was found in Archuleta's vehicle in which he transported three pounds of methamphetamine for sale.[8] He intended to conduct the drug transaction with the undercover officers in his vehicle. It was only because Gonzales refused to enter his vehicle that the transaction did not occur

---

[8] Archuleta's possession of the third pound of methamphetamine for sale is relevant to our discussion because the application notes to USSG §5C1.2(a)(2) define the term "offense" as both the offense of conviction and all relevant conduct. USSG §5C1.2, comment. (n.3).

where the firearm was present. Even when Archuleta entered the undercover vehicle without the firearm, it remained accessible and only a few yards away. Moreover, it remained with the other pound of methamphetamine Archuleta intended to break up and sell in smaller quantities. This is hardly "coincidental or *entirely* unrelated" to the drug transaction. *Walters*, 269 F.3d at 1219 (emphasis added). Even if the firearm did not directly facilitate the drug transaction (as the district court concluded), it certainly had the potential to do so.

Archuleta, like the district court, relies on the fact he only admitted to purchasing the firearm to protect the expensive rims and tires on his vehicle. This story, while convenient, stretches credulity since Archuleta purchased the gun several months prior to purchasing the rims and tires – yet while he was distributing methamphetamine. Nevertheless, even deferring to the court's credibility determination on this matter, the fact Archuleta would use the firearm to protect rims and tires valued at $3,000 lends itself to the reasonable inference that he would use the firearm to protect drugs valued at $11,200.[9]

The district court clearly erred in determining Archuleta was safety-valve eligible. Consequently, it erred in sentencing him without regard to the ten-year mandatory minimum and in applying the two-level reduction under USSG §2D1.1(b)(7).

---

[9] Archuleta argues it is lawful in New Mexico for an individual to possess and carry a concealed and loaded firearm within their vehicle for protection of their property. *See* N.M. Stat. § 30-7-2(A)(2). However, it is illegal under federal law for an individual to use or carry a firearm while engaged in drug-trafficking. *See* 18 U.S.C. § 924(c).

B.  Minor Role

The government argues the district court erred in granting Archuleta a three-level reduction under USSG §2D1.1(a)(3) and a two-level downward adjustment under USSG §3B1.2(b) based on its conclusion Archuleta was a minor participant.  A court's determination that a defendant was a minor participant is a factual finding which we review for clear error.  *United States v. Youngpeter*, 986 F.2d 349, 354 (10th Cir. 1993).

USSG §3B1.2(b) provides for a two-point downward adjustment in the offense level if the defendant "was a minor participant" in the criminal activity. If the defendant receives an adjustment under USSG §3B1.2 and his base offense level is 34 or 36, USSG §2D1.1(a)(3) provides for an additional three-level reduction in the offense level.  USSG §3B1.2(b)'s "minor participant" adjustment applies to a defendant "who is less culpable than most other participants, but whose role could not be described as minimal."  USSG §3B1.2, comment. (n.5). The defendant bears the burden of proving by a preponderance of the evidence that he is entitled to such adjustment.  *United States v. Mendoza*, 468 F.3d 1256, 1264 (10th Cir. 2006).

In determining Archuleta was a minor participant, the district court stated:

The evidence shows . . . Mr. Enriquez[] was the one who set up the drug deal through numerous conversations with Agent Gonzales.  Mr. Enriquez had done a drug deal with the agent on another occasion before the arrest at issue.  Mr. Enriquez negotiated the price of the methamphetamine with Agent Gonzales, and it was Mr. Enriquez who negotiated the time and the place of the deal.

At trial, Agent Gonzales testified that he asked Mr. Enriquez if his bro would find $5500 per pound of methamphetamine acceptable,

-16-

instead of $5,700 per pound, the rate that he had previously negotiated with Mr. Enriquez.

At that time, Mr. Enriquez said, let me check, and I'll call you back. He called a short time later, and a price of $11,200 was agreed on.

I note that there is no evidence that Enriquez called Mr. Archuleta to negotiate the price. In fact, the defendant's cell phone was seized at the time of his arrest, but no attempt was ever made to trace his cell phone records.

From the evidence before me, it appears that the only role the defendant played in this transaction was obtaining and delivering the methamphetamine at Mr. Enriquez'[s] request. Based on these facts, I find that [Mr. Archuleta] was less culpable than Mr. Enriquez, and therefore, is a minor participant, and is eligible for a two-level decrease in offense level.

(R. Vol. III at 870-71.) The court clearly erred in finding Archuleta was a minor participant because this finding is not supported by the evidence.

The evidence, which was uncontradicted, demonstrated Gonzales unsuccessfully attempted to purchase two pounds of methamphetamine from Enriquez and agreed to purchase them instead from Archuleta. When Gonzales asked Enriquez whether Archuleta would accept $11,000 for the drugs, Enriquez informed him he would have to check with Archuleta and would call him back. A short time later, Enriquez called Gonzales and told him Archuleta would accept $11,200. After his arrest, Archuleta informed law enforcement officers he obtained the two pounds of methamphetamine he intended to sell to the undercover officers, as well as the one pound of methamphetamine found in his vehicle, from Marco Sanchez, not Enriquez. He also stated he purchased four to five pounds of methamphetamine weekly from Sanchez and had purchased thirty-

six pounds of methamphetamine from Sanchez between August 2000 and June 13, 2001.[10]  Additionally, he stated he had intended to break up the one pound of methamphetamine found in his vehicle and sell it.  This evidence demonstrates Archuleta was not less culpable than Enriquez as to the June 13, 2001 transaction but rather that Archuleta was more culpable than Enriquez.  It was Archuleta, not Enriquez, who obtained the drugs from his source, decided the ultimate price, and delivered the drugs to the officers.  Enriquez merely served as the middleman.

The district court's reasoning to the contrary is flawed.  It relies in part on the fact the government did not produce Archuleta's cellphone records to show a call occurred between him and Enriquez after Enriquez informed Gonzales he would see if Archuleta would accept $11,000 for the drugs.  But Gonzales never testified Enriquez was going to *call* Archuleta, as opposed to meeting him in person, so such phone call may not even exist.  In any event, it was not necessary for the government to show an actual call was made because Archuleta, not the government, bears the burden of showing he is entitled to the adjustment.  Moreover, based on Gonzales' testimony (which the district court did not find untrustworthy and which the jury obviously relied upon to convict) and the fact Enriquez did not immediately agree to the suggested price, the reasonable inference is that Enriquez did check with Archuleta concerning the price and it

_____

[10] We recognize Archuleta's statements do not add up.  Had he purchased four to five pounds of methamphetamine weekly from Sanchez between August 2000 and June 2001, he would have purchased substantially more than thirty-six pounds of methamphetamine.  Nevertheless, the key point is that Sanchez, not Enriquez, was Archuleta's supplier and more importantly, that it was Sanchez, not Enriquez, who had supplied Archuleta with the three pounds of methamphetamine involved in the June 13, 2001 offense.

-18-

was Archuleta, not Enriquez, that determined the ultimate price. Indeed, Gonzales testified that in his previous dealings with Enriquez, Enriquez never had to check with another individual before setting the price.

The district court clearly erred in finding Archuleta was a minor participant in the June 13, 2001 transaction and entitled to a three-level reduction and a two-level downward adjustment under USSG §2D1.1(a)(3) and §3B1.2(b), respectively.

The judgment is **REVERSED** and this case is **REMANDED** for re-sentencing in accordance with this Order and Judgement.

ENTERED FOR THE COURT


Terrence L. O'Brien
Circuit Judge